**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| STEPHANIE TARAPCHAK | |
| Appellant | No. 281 MDA 2018 |

Appeal from the Judgment of Sentence Entered March 10, 2016
In the Court of Common Pleas of Lackawanna County
Criminal Division at No.: CP-35-CR-0000550-2014

BEFORE:  PANELLA, P.J., STABILE, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY STABILE, J.:                     **FILED JUNE 23, 2020**

Appellant Stephanie Tarapchak appeals *nunc pro tunc* from the March 10, 2016 judgment of sentence entered in the Court of Common Pleas of Lackawanna County ("trial court"), following her jury convictions for insurance fraud, theft by deception, corrupt organizations, perjury, endangering the welfare of children ("EWOC"), drug delivery resulting in death, distributing prescription to drug dependent person, and refusal or failure to keep records.[1] Upon review, we affirm.

The facts and procedural history of this case are undisputed.[2] Appellant operated a small internal medicine practice in Ashland, Pennsylvania.  She

---

[1] 18 Pa.C.S.A. §§ 4117(a)(2), 3922(a)(1), 911(b)(2), 4902(a), 4304(a)(1), 2506(a), and 35 P.S. § 780-113(a)(13), (21), respectively.

[2] Unless otherwise specified, these facts come from the trial court's July 17, 2019 opinion.  **See** Trial Court Opinion, 7/17/19, at 3-6, 27-30, 42-43, 51-53.

became the focus of an extensive narcotics and drug diversion investigation, which led to an audit of her DEA, license, including prescription orders, practices, and dispensation in January 2008 through February 2012, spanning three Pennsylvania counties, Lackawanna, Luzerne, and Schuylkill. Concomitantly, Appellant prescribed and dispensed excessive amounts of narcotics to her paramour, Delton Bolton, as well as her minor child, F.T., whereby Appellant became engaged in a hostile custody dispute with her ex-husband, Alex Tarapchak. Additionally, Appellant was investigated in connection with the fatal drug overdose of Thomas Kromer (the "victim"). On April 7, 2014, the Office of the Attorney General charged Appellant with, *inter alia*, the above-mentioned offenses.

Subsequently, on September 21, 2015, Appellant proceeded to a two-week jury trial on all of the above-cited criminal offenses. During trial, the Commonwealth presented thirty-four witnesses and admitted a voluminous amount of exhibits. With respect to the victim's death, the Commonwealth offered the testimony of six witnesses.

First, several witnesses including Deputy Coroner, David Truskowsky, pharmacy manager Scott Rishel, and pain management expert, Dr. Stephen Thomas testified that Appellant prescribed Oxycodone to the victim on June 6, 2011. Second, Mr. Rishel, and Dr. Thomas testified that Appellant prescribed an increased dosage and prescription, which was not in good faith or in accordance with treatment principles accepted by a responsible segment of the medical profession in violation of the Controlled Substance, Drug,

Device, and Cosmetic Act. Specifically, Dr. Thomas testified that Appellant failed to comply with the minimal activities outlined by the Pennsylvania Code for prescribing controlled substances. He noted that Appellant failed to document any medical decision making regarding the victim throughout his seven years as her a patient. Dr. Thomas testified that despite Appellant's recognition of the victim's apparent physical susceptibility as an individual, and apparent misuse/abuse of his opioid prescription, Appellant enhanced the toxicity of his opioids and did nothing to minimize the fatal effects. Mr. Rishel testified that the victim's May 19, 2011 Oxycodone prescription should not have necessitated a re-fill prior to June 14, 2011. He recalled that on June 6, 2011, Appellant prescribed an increased dosage and a different medication so as to enable the victim to re-fill his prescription early, and evade insurance restrictions. He verified that if the victim attempted to re-fill the May 19, 2011 Oxycodone prescription on June 6, 2011, his insurance would have rejected payment. Importantly, Mr. Rishel explained that if a person seeks to re-fill a prescription earlier than their supply expiration, then the person must be ingesting the prescription above the therapeutic range.

Third, forensic pathologist, Dr. Richard Bindie, and pain management expert, Dr. Thomas, testified that the victim died as a result of using the June 6, 2011 Oxycodone prescription. Dr. Bindle testified within a reasonable degree of medical certainty that the combined adverse effects of the multiple drugs in the victim's system induced depressed respiration and arrhythmia. Dr. Thomas testified within a reasonable degree of medical certainty that the

normal therapeutic concentration of Oxycodone is less than 100 nanograms per ML and death has been known to occur in susceptible individuals at a level greater than 200 nanograms ML. In this case, Dr. Thomas noted that the victim's urine concentration reflected Oxycodone at 300 nanograms ML, the highest concentration of any controlled substance within his system at death. Similar to Dr. Bindie, Dr. Thomas confirmed that the Alprazolam within the therapeutic range and the Oxycodone in the toxic range acted synergistically to cause respiratory depression and led to the victim's death.

Finally, Tracy and David Kuczynski testified that the victim appeared overmedicated and disheveled. Mrs. Kuczynski noted that Appellant failed to provide the victim with instructions or safety mechanisms to prevent abuse and ensure that the victim ingested his prescriptions within the therapeutic range. Mr. Kuczynski confirmed that Appellant hardly ever examined or evaluated the victim prior to filling his prescriptions. He also confirmed that Mr. Kromer re-filled his prescriptions at least seven to ten days earlier than his supply expiration. Mr. Rishel corroborated that the victim's May 19, 2011 Oxycodone prescription should have lasted until June 14, 2019. Instead, Mr. Rishel recalled that Appellant increased the dosage of the victim's prior prescription and changed the medication to Oxycodone without Tylenol. He explained Appellant's modification enabled an early re-fill, evaded insurance restrictions, and represented an increase three times the strength of his previous prescription.

Dr. Bindie opined that a patient like the victim, who is predisposed to arrhythmia and is prescribed opiates will experience adverse effects that could increase blood pressure or decrease oxygen and lead to cardiac arrest. He testified that an individual will die from arrhythmia produced by the combination of all the drugs that were present in the victim's urine concentration at death. Lastly, Dr. Thomas testified that the victim lacked a medical record, lacked regular visitation or examination, yet he obtained prescriptions from Appellant at an accelerating pace. He observed that Appellant enabled the victim, a susceptible individual to misuse/abuse his prescriptions at a continuing and accelerated rate. Dr. Thomas concluded that Appellant prescribed a toxic dosage of Oxycodone to the victim for an underlying headache without any documented medical rationale in order to bypass the victim's insurance safeguards. Dr. Thomas found that Appellant's actions were anything but accidental and showed no consideration for the consequences of her increase to the victim, an individual she knew susceptible to psychiatric illness and arrhythmia consumed his opioids in a haphazard and reckless manner.

The Commonwealth also presented evidence demonstrating that Appellant owned the internal medicine practice in Ashland. Appellant exhibited control of the distribution of narcotics to individuals in Ashland through her internal medicine practice and fraudulently billed insurance companies.

Appellant's paramour, Mr. Bolton, testified that Appellant dispensed or prescribed quantities of Vicodin and testosterone to him throughout their two year relationship utilizing the Moore catalog. He recognized the Moore catalog, and described in detail the manner in which Appellant ordered the Vicodin, and designated the location of the Vicodin, on the nightstand. Mr. Bolton testified that he became a daily Vicodin user. He ingested fifteen pills at one hundred and fifty milligrams. Similarly, Mr. Bolton routinely employed testosterone injections. All controlled substances knowingly supplied by Appellant, despite Mr. Bolton's apparent addiction. In fact, Mr. Bolton described the manner in which Appellant surreptitiously provided an elderly patient's blood sample on behalf of Mr. Bolton, and increased the dosages of Adderall so as to bypass insurance regulations.

Mr. Bolton related that he suffered withdrawal symptoms when he fought with Appellant, and Appellant controlled his access. He felt manipulated and compelled to stay with Appellant so as to feed his addiction. He testified: "our relationship was very codependent [. . .] I was sick of being dependent on the medicine [. . .] I wanted to be able to wake up and not have to [. . .] need 5 Vic 10's to function to go to work [. . .] and it didn't happen. She dangled that out there. And then next thing you know, I'm taking them and I'm in a vicious cycle again." Mr. Bolton verified Appellant's awareness of his addiction, and admitted that they discussed his addiction on several occasions. Dr. Babar Choudhry confirmed Appellant's awareness of Mr. Bolton's addiction, and testified that Appellant became a part of his

discharge plan. Dr. Choudhry warned Appellant to discontinue the psychiatric and pain medication prescriptions.

Dorothy Berg, an insurance representative, testified that the insurance company relied on Appellant's misrepresentations as material information necessary to process payment. Ricky White (Appellant's former paramour who oversaw the billing department), Kelly McDonald (Appellant's office manager), and Ms. Berg testified that Appellant always billed using codes 99214 or 99215 and billed the same treatments for the same patient on multiple occasions. Mr. White testified that Appellant submitted false claims with the intent to defraud the insurance company, in that Appellant billed, and re-billed for treatments knowing that the treatments never occurred. Mr. White clarified multiple explanation of benefits letters listing dates of services that made his presence or her presence clearly impossible. Conspicuously, Appellant billed for dates of services, which included: a few days after giving birth, during a scheduled court appearance, and while Mr. White and Appellant were court ordered to have no contact as well as days Mr. White worked. Both Ms. McDonald and Mr. White testified that Appellant held intimate knowledge of the billing practice, refused to outsource the billing, and retained control over and complicity with the fraudulent claims.

Similarly, Ms. Berg indicated that Capital Blue Cross began flagging claims submitted by Appellant's medical practice. In 2008 and 2009, Capital Blue Cross notified Appellant's practice of its improper 99215 coding versus the procedures actually performed. Although Capital Blue Cross and Ms. Berg

informed Appellant of the coding problem, Appellant's medical practice continued to bill at 92214 and 92215 codes without complete medication documentation. Ms. Berg testified that she discussed the use of the incorrect code with Appellant and provided alternative codes to office manager Ms. McDonald; however despite being advised, Capital Blue Cross received subsequent claims in 2011 with the code 92215 lacking any documentation on the patient's progress note.

At the conclusion of trial, the court granted demurrer as to the charge of controlled substance contraband to confined persons, 18 Pa.C.S.A. § 5123(a). Thereafter, the jury began deliberations, and on October 6, 2015, the jury found Appellant guilty of insurance fraud, theft by deception, corrupt organizations, perjury, EWOC, drug delivery resulting in death, distributing prescription to a drug dependent person, and refusal or failure to keep records.[3]

The trial court directed the Lackawanna County Adult Probation Department to prepare a pre-sentence investigative report ("PSI"). In preparation for sentence, the court carefully reviewed the applicable standard Sentencing Guidelines, Appellant's PSI, a Sentencing Memo dated February 22, 2016, including all mitigating and aggravating factors, as well as correspondence from victims, and oral statements by Appellant's children and

---

[3] The jury acquitted Appellant of other charges, including criminal conspiracy, recklessly endangering another person, acquisition by misrepresentation or fraud, and administration or prescription of controlled substances outside the scope of practice.

current paramour. Additionally, the court carefully considered Appellant's underlying criminal conduct, the seriousness and frequency of Appellant's offenses, as well as the particularized facts associated with Appellant's conduct, placing her patients at risk and causing loss of life. The court stated: "your understanding that came from your medical background was put aside as you attempted to provide people who you clearly knew were addicted with things that would only enhance their addiction, and, as in this case, result in the loss of life of one of those people." Further, the court stated: "when I saw that you put drugs in the hands of a member of your own family who was a minor. That presents serious problems to the court, because I don't know what was clouding your thinking, because in your mind you had to know you were doing wrong. To give a prescription without the appropriate diagnostic procedures and having to treat the person fully, clearly is doing wrong from the perspective of being a healer of people." Therefore, the court sentenced Appellant to an aggregate term of ninety to one hundred and eighty months' imprisonment.[4]

Subsequently, on July 5, 2016, Appellant filed a counseled "Petition for Review Post-Sentence Motion *Nunc Pro Time*." Upon conclusion of a hearing

_____

[4] In particular, Appellant was sentenced to three to six months' incarceration with respect to insurance fraud, six to twelve months with respect to theft by deception, nine to eighteen months for corrupt organizations, nine to eighteen months for perjury, three to six months for EWOC, sixty to one hundred and twenty months for drug delivery resulting in death, three to six months for distributing prescription to a drug dependent person, and six months' probation for refusal or failure to keep records.

held on September 7, 2016, the court held the matter under review, wherein Appellant filed a supplemental brief in support on October 28, 2016. While pending review, Appellant prematurely filed a *pro se* notice of appeal, and later sought removal of post-trial counsel. On September 11, 2017, Appellant filed a *pro se* petition under the Post- Conviction Collateral Relief Act, citing abandonment of post-trial counsel and an inability to file a direct appeal. On January 17, 2018, the PCRA court reinstated Appellant's ability to file a direct appeal and appointed appellate counsel. On February 6, 2018, Appellant filed a timely notice of appeal to this Court. Due to the voluminous and complex nature of Appellant's case, appellate counsel requested multiple extensions to file a concise statement. Appellant filed a concise statement on December 18, 2018, raising fourteen assertions of error. In response, the trial court issued a detailed Pa.R.A.P. 1925(a) opinion, concluding that Appellant was not entitled to relief.

On appeal, Appellant presents the following issues for our review:

[1.] Whether the evidence was insufficient as a matter of law to sustain a conviction on the charge of drug delivery resulting in death where the Commonwealth failed to prove the requisite *mens rea* of malice and the element of causation[.[5]]

---

[5] To the extent Appellant argues that the evidence was insufficient because she was acquitted on a separate, general charge under 35 P.S. § 780-113(a)(14), such argument is waived, as the Commonwealth points out, because she failed to raise it in her Rule 1925(b) statement. **See** Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); **see Commonwealth v. Castillo**, 888 A.2d 775, 780 (Pa. 2005) (stating, "[a]ny issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived.").

[2.] Whether the evidence presented by the Commonwealth was insufficient as a matter of law to establish each element beyond a reasonable doubt for the crime of conviction of Corrupt Organizations in violation of 18 Pa. C.S.A. § 911(b)(2)[.]

[3.] Whether the trial court erred and abused its discretion in allowing the substance of text messages and Facebook messages to be admitted into evidence and attributed to Appellant without proper foundation and authentication establishing that Appellant was the author of said message[.]

[4.] Whether the trial court erred and abused its discretion in allowing the testimony of James Hirscher that Appellant's daughter suffered an overdose as a result of medication alleged provided by Appellant[.]

[5.] Whether the trial court erred and abused its discretion in allowing the admission of transcripts from Appellant's custody matter with judicial findings that the [c]ourt believed that Appellant had lied[.]

[6.] Whether the trial court erred as a matter of law in admitting evidence of prior bad acts pursuant to Pa. R. E. 404(b) including:

> i. Testimony of Karen Mervine regarding her belief that Appellant was responsible for Mervine's mother's addiction, as well as testimony regarding drug addicts frequenting Appellant's office and her opinion that Appellant allowed Kelly McDonald to illegally write prescriptions;

> ii. Testimony of Robert Phillips that left the erroneous impression that Appellant committed a crime when she was in possession of prescription medication for which no criminal charges were filed or sought[.]

[7.] Whether the trial court erred as a matter of law and violated Appellant's Due Process rights by failing to instruct the jury that they must not draw any adverse inference from her decision to remain silent, rather than take the witness stand in her own defense[.]

[8.] Whether, to the extent that any evidence was properly admitted pursuant to an exception under Rule 404(b), the trial court erred as a matter of law in failing to identify and failing to

> instruct the jury detailing the limited purpose(s) for which such evidence may be considered, thereby depriving Appellant of a fair trial[.]

Appellant's Brief at 5-6.

At the outset, as the Commonwealth notes and we agree, Appellant has waived several of her issues on appeal. In particular, she has waived issues 3, 4, 5, 6(i), 7 and 8 because she failed to preserve them in the trial court. With respect to issues 3 through 6(i), our review of the record confirms that Appellant failed to assert contemporaneous objections to evidence admitted at trial. It is settled that an appellant's "failure to raise a contemporaneous objection to evidence at trial waives that claim on appeal." *Commonwealth v. Thoeun Tha*, 64 A.3d 704, 713 (Pa. Super. 2013) (citation omitted); *see Commonwealth v. Baumhammers*, 960 A.2d 59, 73 (Pa. 2008) (to preserve issue for appellate purposes, party must make timely and specific objection to ensure trial court has opportunity to correct alleged error); *Keffer v. Bob Nolan's Auto Service, Inc.*, 59 A.3d 621, 645 (Pa. Super. 2012) ("one must object to errors, improprieties or irregularities **at the earliest possible stage** of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.") (citations omitted) (emphasis added); *see also* Pa.R.E. 103(a) (providing that an "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless . . . a timely objection . . . appears of record."); Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

With respect to issues 7 and 8, Appellant neither requested an adverse inference and a Rule 404(b) instructions nor objected to their omission. Failure to request an instruction upon the introduction of evidence "constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction." *Commonwealth v. Bryant*, 855 A.2d 726, 739 (Pa. 2004); *see* Pa.R.Crim.P. 647(C) ("No . . . omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate. All such objections shall be made beyond the hearing of the jury."). Even if these issues were not waived, we would still conclude Appellant would not be entitled to relief based on the reasons set forth in the trial court's 1925(a) opinion. *See* Trial Court Opinion, 7/17/19, at 55-71, 73-82.

We now turn to Appellant's first two issues, which challenge the sufficiency of evidence. In particular, Appellant argues that the evidence was insufficient to sustain her convictions for drug delivery resulting in death and corrupt organizations. A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be

resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Appellant's sufficiency challenge regarding drug delivery resulting in death lacks merit. At the time of the victim's death, the then in-effect and now repealed version of Section 2506 of the Crimes Code provided:

A person commits murder of the third degree who administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the act of April 14, 1972 (P.L. 233, No. 64) known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a) (repealed Sept. 6, 2011). In *Commonwealth v. Ludwig*, 874 A.2d 623 (Pa. 2005), the Supreme Court found that although the now-repealed Section 2506(a) did not contain an explicit *mens rea*, "the General Assembly has provided a default culpability provision in Section 302(c) of the Crimes Code that is to be applied to determine the appropriate element of culpability." *Ludwig*, 874 A.2d at 630. The Court concluded that, by designating the crime as one of murder in the third degree, culpability was

otherwise provided because it had long held that the *mens rea* for murder in the third degree was malice. ***Id.*** at 630–31.

Here, after careful review of the record and relevant case law, we conclude that the trial court accurately and thoroughly addressed the merits of Appellant's sufficiency challenge regarding her conviction for drug delivery resulting in death. ***See*** Trial Court Opinion, 7/17/19, at 17-36. The court found, among other things, that Appellant demonstrated extreme indifference to human life by continuing to prescribe the victim opioids at an accelerated pace without (a) adequately evaluating him, (b) maintaining medical records or (c) a prescribing rationale. ***Id.*** at 34. The trial court found that Appellant was aware that the victim "consumed his opioid prescriptions in a haphazard and reckless manner, presented with several psychiatric diagnoses as well as chronic obstructive pulmonary disease, and possessed a predisposition for arrhythmia." ***Id.*** Yet, "she deliberately increased the potency and dosage" of his prescriptions "so as to bypass the restraint of the insurance company." ***Id.*** In so doing, Appellant consciously disregarded an unjustified and extremely high risk that her actions might cause death or seriously bodily injury. ***Id.*** Accordingly, we agree with the trial court's conclusion that, viewed in a light most favorable to the Commonwealth, the evidence establishes that the Commonwealth proved beyond a reasonable doubt that Appellant committed drug delivery resulting in death.

In her second issue, Appellant challenges the sufficiency of the evidence supporting her conviction for corrupt organizations. Section 911 of the Crimes

Code, relating to corrupt organizations, provides in relevant part that "[i]t shall be unlawful for any person through a pattern of racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise." 18 Pa.C.S.A. § 911(b)(2). "Racketeering activing" is "[a]n act which is indictable under any of the following provisions of [the Crimes Code]," including, *inter alia*, theft, insurance fraud, and violation of the Controlled Substances Act. 18 Pa.C.S.A. § 911(h)(1)(i), (ii). A "pattern of racketeering activity" is "a course of conduct requiring two or more acts of racketeering activity[.]" 18 Pa.C.S.A. § 911(h)(4). An "enterprise" is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S.A. § 911(h)(3).

Here, we conclude that the trial court also accurately and thoroughly addressed the merits of Appellant's sufficiency challenge regarding her conviction for corrupt organizations. *See* Trial Court Opinion, 7/17/19, at 36-55. The trial court found, *inter alia*, that Appellant "either directly or indirectly participated in a pattern of racketeering activity through the two predicate acts of Insurance Fraud, and Distributing Prescriptions to Drug Dependent Person." *Id.* at 53-54. The court reasoned:

> The two predicate acts formed a pattern related to the enterprise in that Appellant used the resources of her medical practice to acquire and maintain through the Moore catalog an inventory of narcotics. She utilized this inventory to supply Vicodin to her drug-addicted paramour without a prescription so as to avoid

insurance regulations and criminal investigation. She further used the resources of the enterprise, including the labor of her employees, and unwitting patients to receive income from insurance companies and funnel the income to herself under the guise of legitimate income. Appellate engaged in illegal commerce on an ongoing regular basis, supplying patients with excessive opioid prescriptions without conducting examinations, or documenting her medical decision making, yet fraudulently billing insurance companies as if she did.

*Id.* at 54. We therefore agree with the trial court's conclusion that, viewed in a light most favorable to the Commonwealth, the evidence establishes that the Commonwealth proved beyond a reasonable doubt that Appellant was guilty of corrupt organizations.

We finally address Appellant's sole remaining issue challenging the trial court's evidentiary ruling admitting testimony of Mr. Robert Phillips. It is settled:

> [a]dmission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Tyson*, 119 A.3d 353, 357-58 (Pa. Super. 2015) (internal citations omitted). Moreover, an appellant bears a "heavy burden" to show that the trial court has abused its discretion. *Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015).

We conclude the trial court did not abuse its discretion in permitting Mr. Phillips, a Deputy Sheriff for the Schuylkill County Domestic Relations Office,

to testify regarding Appellant's possession of narcotics (Percocet 30s tablets) wrapped in cellophane when Appellant was not charged with any crimes relating to the possession. Trial Court Opinion, 7/17/19, at 71-72. The trial court reasoned that Mr. Phillips' testimony was admissible "to show motive to commit criminal acts and support her addition." *Id.* at 73. Moreover, evidence of "Appellant's drug addiction explains the history of the case, including events surrounding her criminal conduct for which [she] is charged." *Id.* Mr. Phillips' testimony was not prejudicial in that it did not create in the minds of the jury an impression that Appellant had committed a crime, much less a possessory crime. Mr. Philips expressly testified that Appellant claimed to have a valid prescription for the narcotics and that she was never charged with any crimes relating to her possession of the same. *Id.* Thus, the court found, and we agree, "the probative value of Mr. Phillips' testimony outweighed the prejudicial effect." *Id.*

In sum, we conclude that Appellant waived issues 3, 4, 5, 6(i), 7 and 8, the evidence was sufficient to sustain her convictions for drug delivery resulting in death and corrupt organizations, and the trial court did not abuse its discretion in allowing Mr. Philips to testify regarding Appellant's possession of narcotics. Accordingly, we affirm Appellant's March 10, 2016 judgment of sentence. We further direct that a copy of the trial court's July 17, 2019 Rule 1925(a) opinion be attached to any future filings in this case.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>06/23/2020</u>

COMMONWEALTH OF : IN THE COURT OF COMMON PLEAS
PENNSYLVANIA : OF LACKAWANNA COUNTY
:
v. : CRIMINAL DIVISION
:
STEPHANIE TARAPCHAK : 14 CR 550
:

---

## MEMORANDUM

### BRAXTON, S. J.

This opinion is filed pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate

Procedure and pursuant to the request of the Pennsylvania Superior Court. The

Appellant's grounds for appeal are as follows:

A. Whether the trial court erred and abused its discretion in allowing the substance of text messages and Facebook messages to be admitted into evidence and attributed to Appellant without foundational evidence proving that appellant was the author of said messages through the testimony of James Hischar?

B. Whether the evidence was insufficient as a matter of law to sustain a conviction on the charge of drug delivery resulting in death as the Commonwealth failed to prove the requisite mens rea of malice and failed to produce sufficient evidence to sustain a verdict of guilty on the element of causation?

C. Whether the evidence was insufficient as a matter of law to sustain a conviction on the charge of corrupt organizations as the Commonwealth failed to produce sufficient evidence to support a finding that Appellant participated in racketeering activity and that an "enterprise" existed?

D. Whether the trial court erred as a matter of law and violated the Appellant's due process rights by failing to instruct the jury that they must not draw any adverse inference from her decision to remain silent rather than take the witness stand in her own defense?

E. Whether the trial court erred as a matter of law in denying the Appellant's pre-trial motion to dismiss for lack of jurisdiction as the case was not properly venued in Lackawanna County since the charges joined for trial were not part of a single criminal episode and lacked the requisite factual basis to sustain such a finding, and the facts underlying the Appellant's medical practice and actions associated with same occurred outside Lackawanna County and should have been tried in Schuylkill County violating the Appellant's due process rights?

F. Whether the trial court erred as a matter of law in admitting evidence of the following prior bad acts pursuant to Pa. R. E. 404 (b)?

   a. The testimony of Alex Tarapchak regarding custody proceedings and allegations of drug use by the Appellant; Tarapchak's ex-husband when she had opposed in a contentious custody battle, testify that Tarapchak used drugs all the time but no judge did anything to her, and no notice was given of their intent to use such conduct;

   b. The admission of transcripts from the Appellant's custody hearing with judicial findings that the court believed that the Appellant had lied;

   c. Testimony of Delton Bolton regarding the Appellant's drug and alcohol use;

   d. Testimony of Karen Mervine regarding her belief that that the Appellant was responsible for Ms. Mervine's mother's addiction as well as testimony regarding drug addicts frequenting the Appellant's office and her opinion that the Appellant allowed Kelly McDonald to illegally write prescriptions;

   e. Testimony of Robert Phillips that left the erroneous impression that the Appellant committed a crime when she was in possession of prescription medication for which no criminal charges were filed or sought;

   f. Testimony detailing the prescription statistics of Dr. Kraynick who was not charged individually or as a co-conspirator with the Appellant. This testimony erroneously suggested to the jury that the Appellant engaged in illegal conduct with Dr. Kraynick;

2

g. Testimony of Trooper James Hischar that the Appellant's daughter suffered an overdose as a result of medication allegedly provided by the Appellant.

G. Whether the trial court erred as a matter of law in failing to identify a limitation on Rule 404(b) evidence and failing to instruct the jury detailing the limited purpose(s) for which such evidence may be considered, depriving the Appellant of a fair trial?

## FACTUAL AND PROCEDURAL HISTORY

Appellant, Stephanie Tarapchak operated a small internal medicine practice in Ashland, Pennsylvania. She became the focus of an extensive narcotics and drug diversion investigation, which led to an audit of her DEA license, including prescription orders, practices, and dispensation in January 2008 through February 2012, spanning three Pennsylvania counties, Lackawanna, Luzerne, and Schuylkill. Concomitantly, the Appellant prescribed and dispensed excessive amounts of narcotics to her paramour, Delton Bolton, as well as her minor child, Fallon Tarapchak, wherein the Appellant _____ in a hostile custody dispute with her ex-husband, Alex Taranchak. As a result of the investigation, on April 7, 2014, the Office of the Attorney General charged the Appellant with the following: one (1) count of Insurance Fraud, 18 C.S. §4117 (a)(2); one (1) count of Theft By Deception-False Impression, 18 Pa. C.S. §3922(a)(1); one (1) count of Criminal Conspiracy to Commit Theft By Deception, 18 Pa. C.S. §903; one (1) count of Corrupt Organizations, 18 Pa. C.S. §911; one (1) count of Recklessly Endangering Another Person, 18 Pa. C.S. §2705; one (1) count of Perjury, 18 Pa. C.S. §4902(a); one (1) count of Endangering the Welfare of Children, 18 Pa. C.S. §4304(a)(1); one (1) count of Controlled Substance Contraband to Confined Persons, 18 Pa. C.S. §5123(a); one (1) count of Drug Delivery Resulting in Death, 18 Pa. C.S.

3

§2506(a); one (1) count of Acquisition by Misrepresentation Fraud, etc., 35 P.S. §780-113(a)(12); one (1) count of Distributing Prescription to Drug Dependent Person, 35 P.S. §780-113(a)(13); one (1) count of Prohibited Acts, etc. Outside Scope of Practice, 35 P.S. §780-113(a)(14); and one (1) count of Prohibited Acts, Refusal or Failure to Keep Records, 35 P.S. §780-113(a)(21).

Subsequently, on September 21, 2015, the Appellant proceeded to a two- week jury trial on all of the above-cited criminal offenses. (Notes to Testimony hereinafter, "N.T." September 21, 2015). During trial, the Commonwealth presented thirty-four (34) witnesses and admitted a voluminous amount of exhibits. At the conclusion of trial, this Court granted demurrer as to the charge of Controlled Substance Contraband to Confined Persons, 18 Pa. C.S. §5123(a). (N.T. October 5, 2015 p. 22). Thereafter, the jury began deliberation, and on October 6, 2015, the jury found the Appellant guilty as to one (1) count of Insurance Fraud, one (1) count of Theft By Deception, one (1) count of Corrupt Organizations, one (1) count of Perjury, one (1) count of Endangering the Welfare of Children, one (1) count of Drug Delivery Resulting in Death, one (1) count of Distributing- Prescription to Drug Dependent Person, and one (1) count of Prohibited Acts, Refusal or Failure to Keep Records. The jury found the Appellant not guilty as to one (1) count of Criminal Conspiracy to Commit Theft By Deception, one (1) count of Recklessly Endangering Another Person, one (1) count of Acquisition By Misrepresentation Fraud, etc., and one (1) count of Prohibited Acts, Outside Scope of Practice. (N.T. October 6, 2015 p. 5-6).

Accordingly, this Court directed the Lackawanna County Adult Probation Department to prepare a pre-sentence investigative report (hereinafter "PSI"). Id. at 10.

4

...for sentence, this Court carefully reviewed the applicable standard ... the Appellant's PSI, a Sentencing Memo dated February 22, ... all mitigating and aggravating factors, as well as correspondence from ... statements by the Appellant's children and current paramour. ... this Court carefully considered the Appellant's underlying criminal ... seriousness and frequency of the Appellant's offenses, as well as the ... harm associated with the Appellant's conduct, placing her patients at risk ... this Court stated "your understanding that came from your ... was put aside as you attempted to provide people who you clearly ... with things that would only enhance their addiction, and, as in this ... the loss at life of one of those people." (N.T. March 10, 2016 p. 60-61). ... this Court stated "when I saw that you put drugs in the hands of a member of ... family who was a minor ... that presents serious problems to this Court, because ... what was clouding your thinking, because in your mind you had to know ... were doing wrong ... To give a prescription without the appropriate diagnostic ... and having to treat the person fully, clearly is doing wrong from the ... of being a healer of people ... id. at 63. Therefore, this Court sentenced in ... in pertinent part as follows:

Insurance Fraud,
18 Pa. C.S.A. § 4117(a)(2): three (3) – six (6) months

... by Deception/Drug Impression,
35 P.S. ... 780-113(a)(12): six (6) – twelve (12) months

Criminal Organizations,
18 Pa. C.S.A. § 911(b)(3): nine (9) – eighteen (18) months

Perjury,
18 Pa. C.S. §4902(a): nine (9) – eighteen (18) months

Endangering Welfare of Child,
18 Pa. C.S. §4304(a)(1): three (3) – six (6) months

Drug Delivery Resulting in Death,
18 Pa. C.S. §2506(a): sixty (60) – one hundred and twenty (120) months

Distributing Prescription to Drug Dependent Person,
35 P.S. §780-113(a)(13): three (3) – six (6) months, concurrent

Prohibited Acts, Refusal or Failure to Keep Records,
35 P.S. §780-113(a)(21): six (6) months probation

Aggregate Sentence ninety (90) – one hundred and eighty (180) months with six (6) months state probation.

**(N.T. March 10, 2016 p. 66- 81).**

Subsequently, on July 5, 2016, the Appellant filed a counseled "Petition for Review Post-Sentence Motion Nunc Pro Tunc." Upon conclusion of a hearing held on September 7, 2016, this Court held the matter under review, wherein the Appellant filed a Supplemental Brief in Support on October 28, 2016. While pending review, the Appellant prematurely filed a *pro se* Notice of Appeal, and later sought removal of post-trial counsel. On September 11, 2017, the Appellant file a *pro se* petition under the Post-Conviction Collateral Relief Act, citing abandonment of post-trial counsel and an inability to file a direct appeal. On January 17, 2018, this Court reinstated the Appellant's ability to file a direct appeal and appointed appellate counsel. On February 6, 2018, the Appellant filed a timely Notice of Appeal to the Pennsylvania Superior Court. Due to the voluminous and complex nature of the Appellant's case, appellate counsel requested multiple extensions to file a Concise Statement. The Appellant filed a Concise Statement on December 18, 2018.

6

## DISCUSSION[1]

### PRETRIAL

**A. Whether the trial court erred in denying the Appellant's Motion to Dismiss for lack of jurisdiction based upon improper joinder, where it is alleged that the charges joined for trial were not part of a single criminal episode and lacked the requisite factual basis?[2]**

Subject matter jurisdiction speaks to the competency of a court to hear and adjudicate the type of controversy presented. Jurisdiction is purely a question of law; the appellate standard of review is *de novo* and the scope of review is plenary. Controversies stemming from violations of the Crimes Code are entrusted to the original jurisdiction of the courts of common pleas for resolution. All jurists within that tier of the unified judicial system are competent to hear and resolve a matter arising out of the Crimes Code. <u>Commonwealth v. Ellia</u>, 83 A.3d 254, 265 (Pa. Super. 2013). Jurisdiction relates to the court's power to hear and decide the controversy presented. <u>Commonwealth v. Bethea</u>, 828 A.2d 1066, 1074 (Pa. 2003). "[A]ll courts of common pleas have statewide subject matter jurisdiction in cases arising under the Crimes Code." <u>Id</u>. Thus, this Court does possess subject matter jurisdiction in this matter.

The Commonwealth charged the Appellant with having violated the following sections of the crimes code: Insurance Fraud, 18 Pa. C.S. §4117; Theft by Deception, 18 Pa. C.S. §3922; Criminal Conspiracy, 18 Pa. C.S. §903; Corrupt Organizations, 18 Pa.

---

[1] Due to the voluminous and complex nature of the above-captioned matter, this Court has reorganized the order of the Appellant's issues to preserve simplicity and improve continuity in the discussion of each issue.

[2] Listed as issue 5 in the Appellant's Concise Statement of Errors. The Appellant incorrectly combines and muddies subject matter jurisdiction, venue, and joinder in one issue, therefore this Court addresses each legal precept respectively. However, issues not raised in the lower court are waived and cannot be raised for the first time on appeal. Pa. R. A. P. 302(a); *See also* Pa.R.Crim.P. 578, comment ("Types of relief appropriate for the omnibus pretrial motions include the following requests: ... (2) for severance and joinder or consolidation"). In the present case, the Appellant only challenged venue, habeas corpus, and a violation of the statute of limitations in an omnibus pretrial motion. The Appellant did not file a Motion for Severance citing improper joinder. As such, the Appellant's challenge to joinder is waived. Notwithstanding, this Court will address the propriety of joinder within this section.

7

C.S. §911; Recklessly Endangering Another Person, 18 Pa. C.S. §2705; Perjury, 18 Pa. C.S. §4902; Endangering the Welfare of Children, 18 Pa. C.S. §4304; Controlled Substance Contraband to Confined Persons, 18 Pa. C.S. §5123; Drug Delivery Resulting in Death, 18 Pa. C.S. §2506. Also, the Commonwealth charged the Appellant with violating the following sections of the Controlled Substance, Drug Device, and Cosmetic Act: 35 P.S. §780-113(a)(12)-(a)(14);(a)(21). And since these charges were set forth in the same criminal information, joinder is governed by Rule 563 of the Pennsylvania Rules of Criminal Procedure. Pa. R. Crim. P. 563(a) provides: "Two or more offenses, of any grade, may be charged in the same information if: (1) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or (2) the offenses charged are based on the same act or transaction." Under, Pa. R. Crim. P. 563(a), the Appellant's offenses as charged do meet the criteria for joinder. The Commonwealth has established that the offenses charged are based on the same act or transaction.

In Commonwealth v. Grillo, 917 A.2d 343, 344-45 (Pa. Super. 2007), the Pennsylvania Superior Court utilized the analysis regarding 18 Pa. C.S. §110 to determine whether offenses charged are "based on the same act or transaction." The Grillo court explained that while section 110[3] prohibits subsequent prosecution "for any offense based on the same conduct or arising from the same criminal episode," the language "based on the same act or transaction," found in Pa. R. Crim. P. 563(a) is

---

[3] In the instant case, the question presented is whether "the trial court erred as a matter of law in denying the appellant's pre-trial motion to dismiss for lack of jurisdiction [ . . . ] the charges joined for trial were not part of a single criminal episode and lacked the requisite factual basis to sustain such a finding [ . . . ] the joinder of the charges also violated the appellant's Due Process rights." As previously mentioned, the Appellant failed to file a motion for severance. Therefore while the Appellant utilizes compulsory joinder language, this Court surmises that the Appellant is challenging permissive joinder since compulsory joinder is inapplicable.

8

similar and subject to the same analysis to determine whether there was a single criminal episode. The Grillo court considered the factors outlined in Commonwealth v. Lane, 658 A.2d 1353, 1355 (Pa. Super. 1995), which include consideration of the following: (1) the temporal sequence of events, (2) the logical relationship between the acts, and (3) whether they share common issues of law and fact. Further, the concept of a single criminal episode, "must not be from a hyper technical and rigid perspective [ . . . ] thus, where a number of charges are logically and/or temporally related and share common issues of law and fact, a single criminal episode exists, and separate trials would involve substantial duplication and waste of scarce judicial resources." Commonwealth v. Hude, 458 A.2d 170, 183 (Pa. 1983); See also Commonwealth v. Patterson, 546 A.2d 596, 600 (Pa. 1998)(emphasizing that the "the general policy of the law is to encourage joinder of offenses [ . . . ] when judicial economy can thereby be effected, especially when the result will be to avoid the expensive and time-consuming duplication of evidence"). Therefore, when determining whether a number of statutory offenses are "logically related," the court should inquire "whether there is a substantial duplication of factual, and/or legal issues presented by the offenses. If there is duplication, then the offenses are logically related and must be prosecuted at one trial." Hude, supra at 181-183. Further, statutory offenses involving additional issues of law or fact is not sufficient to create a separate criminal episode since "an absolute identity of factual backgrounds," is not required. Id. A single criminal episode should not be limited to acts which are immediately connected in time, and may comprehend a series of many occurrences. Id.

In addition, Pennsylvania Rule of Criminal Procedure 583 states: "The court may order separate trials of offenses [ . . . ] or provide other appropriate relief, if it appears

9

that any party may be prejudiced by offenses [ . . . ] being tried together." Pa. R. Crim. P. 583. Finally, "the decision to sever offenses is within the sound discretion of the trial court and will be reversed only for a manifest abuse of that discretion." <u>Commonwealth v. Collins</u>, 703 A.2d, 418, 422 (Pa. 1997); <u>Commonwealth v. Newman</u>, 598 A.2d 275, 277 (Pa. 1991).

In the present case, all of the Appellant's charges grew out of the same incident and are inextricably intertwined, flowing from the same events, forming parts of the same story. Separate trials would have resulted in a repetition of testimony and needless expenditures of time and resources. Over a four (4) year period the Appellant ran a profitable enterprise in which she fraudulently billed insurance companies, and excessively supplied narcotics to her patients, family members, and paramours through the resources of her internal medicine practice. Much like a television series, each week's story had similar characters/witnesses, and continuity of storyline, with multiple _____ in each county, entwining characters who would not otherwise know each other, and indeed furthering the Appellant's interest in her criminal scheme. The characters/witnesses The Appellant forged her own sequence and linkage of events centered on the supply, distribution, and personal consumption of narcotics. The Appellant's criminal charges share common facts. The Appellant's source of narcotics is the same, the Moore catalog and her prescription pad; the same investigating officers, Agent Hischar and Dorothy Berg among others; the same victims, her patients, her daughter, and her paramours causing fatal and near fatal overdoses. When the Appellant's daughter nearly overdosed on a prescription that the Appellant prescribed, the Appellant concealed that she prescribed her daughter any medication during a

10

Lackawanna County custody proceeding. The Appellant held a motive to lie under oath to protect her prescription practices and thwart any investigation. The Appellant utilized her internal medicine practice to fraudulently receive insurance payments and fund her purchase of narcotics from the Moore catalog. As such, the events described at trial were interwoven with and naturally developed one from the other. See Commonwealth v. Wholaver, 989 A.2d 883 (Pa. 2010)(holding that Murder charges, Sexual Assault charges and Solicitation to commit murder charges should all be tried together because the charges all flowed from the same events and were part of the same story, joinder for trial was appropriate). Here all of the Appellant's charges relate to her involvement as a prescription drug organization. The Appellant's activities were all logically related because they were entwined with, and indeed furthered the interest of the Appellant's prescription drug organization. These activities are all part of the same act or transaction.

Additionally, the evidence of each of the offenses would be admissible in a trial for the other. Each charge is admissible to prove motive, knowledge, opportunity, absence of mistake, and history of the case. The Appellant engaged in several criminal offenses to protect or further her illegal prescription practices. See Commonwealth v. Collins, 703 A.2d 418 (Pa. 1997)(finding no prejudice in permitting the jury to convict based upon distinct, yet interrelated, evidence of those crimes); Commonwealth v. Paolello, 665 A.2d 439 (Pa. 1995)(holding that the admission of relevant evidence connecting a defendant to the crimes charged is a natural consequence of a criminal trial, and it is not grounds for severance by itself); Commonwealth v. Paddy, 800 A.2d 294, 308 (Pa. 2002)(evidence of other crime admissible where it is part of chain or sequence of events which became part of theory of case and formed part of

11

natural development of facts); Commonwealth v. Murphy, 499 A.2d 1080, 1082 (Pa. Super. 1985)(finding evidence admissible where it is part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts). In this case, the Appellant's theft-related charges were explicable in relation to the corrupt organizations charge and drug-related charges. Evidence of the Appellant's other criminal acts completed the story providing immediate context of happenings, in time and place. Each of the Appellant's offenses arose from the Appellant's illegal prescription and illegal business practices relevant to demonstrate the history and natural development of the facts.

Importantly, the fact that the jury separated the charges is evinced by its verdict of not guilty on the Criminal Conspiracy, Recklessly Endangering Another Person, Acquisition by Misrepresentation Fraud, and Prohibited Acts Outside the Scope of Practice. Therefore, the Appellant cannot demonstrate prejudice. As such, this Court did not abuse its discretion.

**B. Whether the trial court erred in denying the Appellant's Motion to Dismiss for lack of jurisdiction based upon improper venue, where it is alleged that the underlying actions occurred outside of Lackawanna County?[4]**

Jurisdiction relates to the court's power to hear and decide the controversy presented. Commonwealth v. Bethea, 828 A.2d 1066, 1074 (Pa. 2003). "[A]ll courts of common pleas have statewide subject matter jurisdiction in cases arising under the Crimes Code."[5] Id. Whereas, venue refers to the convenience and locality of trial, or "the right of a party to have the controversy brought and heard in a particular judicial

---

[4] Listed as issue 5 in the Appellant's Concise Statement of Errors.
[5] Appellant's claim that the Lackawanna County Court of Common Pleas did not have subject matter jurisdiction over criminal conduct occurring in Schuylkill County is without merit. "[A]ll courts of common pleas have statewide subject matter jurisdiction in cases arising under the Crimes Code." Supra, Bethea.

12

district." <u>Bethea</u>, at 1074. Venue assumes jurisdiction exists and it "can only be proper where jurisdiction already exists." <u>Id</u>. at 1074-1075. Even though all common pleas courts may have jurisdiction to resolve a case, such should only be exercised in the judicial district in which venue lies, and venue properly lies in the place where the crime occurred. <u>Id</u>. at 1075. Notwithstanding, dismissal is not the proper remedy for an allegedly improper venue. <u>Commonwealth v. Gross</u>, 101 A.3d 28, 36 (Pa. 2014)(holding that no provision in the rules of criminal procedure permits dismissal as a remedy for improper venue). The moving party bears the burden of demonstrating the necessity of a change of venue. supra, <u>Bethea</u>.

A trial court's decision on a motion for change of venue rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion. <u>Commonwealth v. Drumheller</u>, 808 A.2d 893, 902 (Pa. 2002)(quoting <u>Commonwealth v. Marinelli</u>, 690 A.2d 203, 213 (Pa. 1997). A change of venue becomes necessary when the trial court determines that a fair and impartial jury cannot be selected in the county in which the crime occurred, however, a defendant is not entitled to a change of venue unless she can show that pre-trial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. Pa. R. Crim. P. 584(a). The mere existence of pre-trial publicity does not warrant a presumption of prejudice. <u>Commonwealth v. Dupre</u>, 866 A.2d 1089, 1107-08 (Pa. Super. 2005).

Pre-trial publicity will be presumed prejudicial if:

> the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual or objective; that such publicity revealed the defendant's prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or that it was derived from official police and prosecutorial reports. Even if

13

the defendant proves the existence of one or more of these circumstances, a change of venue or venire is not warranted unless he or she also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

Id.; quoting Commonwealth v. Karenbauer, 715 A.2d 1086, 1092 (Pa. 1998).

Accordingly, the instant proceedings were properly tried in Lackawanna County pursuant to the venue provisions of 42 Pa. C.S. § 4551(d). Section 4551(d) provides: "In any case where a multicounty investigating grand jury returns a presentment the supervising judge shall select the county for conducting the trial from among those counties having jurisdiction." This section of the Judicial Code empowers the supervising judge to designate one county in which several alleged offenses may be consolidated in a single trial. If offenses are otherwise properly consolidated, it is not necessary that the county so chosen be the situs of each and every crime charged. It is enough that one of the offenses being tried occurred in that county. See also Commonwealth v. Bradfield, 508 A.2d 568 (Pa. Super. 1986)(holding that it is unreasonable to believe that the legislature intended separate trials in each county where acts of a criminal nature had been committed, rather, the legislature intended that the supervising judge would select a single county in which all offenses set forth in a presentment could be tried).

The Appellant having supplied Xanax to her minor daughter, Fallon Tarapchak resulting in overdose, having made a false statement under oath during custody proceedings regarding her daughter, Fallon Tarapchak, and having rectally smuggled narcotics into the Lackawanna County prison in Lackawanna County, the supervising

14

judge could direct that the Appellant be tried in Lackawanna County for all the criminal offenses arising from the same criminal scheme to supply and prescribe excessive quantities of narcotics to patients, friends, family members and paramours as well as fraudulently bill insurances companies using the resources of her internal medicine practice. There is ample reason to conclude that acts of crime occurred in Lackawanna County. Neither the evidence nor the charges were so limited or isolated so as to compel trial in Schuylkill County solely because the Appellant's medical practice is located in Schuylkill County. In view of the fact, that the grand jury rendered an indictment against the Appellant based upon a criminal scheme that spanned, Lackawanna, Luzerne, and Schuylkill counties, trial in any one would have been proper.

Furthermore, the Appellant based her venue challenge upon the bald and vague suggestions that a Lackawanna County jury panel might be biased since some offenses occurred in Schuylkill County causing confusion as to why the trial is occurring in Lackawanna County,[5] as well as the limited resources of the Lackawanna County Public Defender's office,[7] and her romantic relationship with Joseph Pilchesky, a publicly litigious individual. The Appellant did not cite to any specific, frequent, or recent publicity that appeared inflammatory or sensational. The Appellant makes no claim that any of the factors that compel the presumption of pretrial prejudice were present in the instant matter. Therefore, this Court did not have to consider the pre-trial publicity factors. In fact, the Appellant's trial occurred approximately more than one (1) year later from the date of the Appellant's motion. See Commonwealth v. Bowser, 624 A.2d 125,

---

[5] See Commonwealth v. Brookins, 10 A.3d 1251 (Pa. Super. 2010)(finding that change of venue was not warranted in prosecution for possession with intent to deliver (PWID), criminal conspiracy, and corrupt organizations, even though defendant argued she committed no criminal acts in county where case was tried).
[7] In this Court's denial order dated October 6, 2014, this Court recognized its ability to provide additional resources to ensure that the Lackawanna County Public Defender's Office rendered a fair and adequate defense.

15

(Pa. Super. 1993)(finding that eleven-month period before trial after pretrial publicity regarding car accident had been disseminated dissipated any potential prejudice by time that proceeding began).

Additionally, the Appellant presented no evidence that any juror formed a fixed opinion of her guilty as a result of the above suggestions, there were no allegations that this Court would be unfair in any way, and there was no indication of how or why jurors would be unable to be fair and impartial. See **Commonwealth v. Devries, 112 A.3d 663** (Pa. Super. 2015). The Appellant did not establish that impartial juries could not be obtained in Lackawanna County. This Court remained satisfied that an objective, open-minded jury could be selected from members of the community.

Similarly, the Appellant did not establish prejudice by having her case tried in Lackawanna County rather than Schuylkill County. The Appellant did not present any witnesses, and all other witnesses required to travel from Schuylkill County to Lackawanna County were the Commonwealth's witnesses. Accordingly, the Commonwealth endured most of the burden by trying the case in Lackawanna County.

Also, the Appellant failed to demonstrate actual prejudice in the seated jurors. This Court conducted an extensive and thorough voir dire of the potential jurors, the result of which was the empaneling of a jury of twelve jurors and alternate jurors, who testified that they had no fixed opinion on the guilt or innocence of the Appellant, and would decide the matter consistent with this Court's instructions and evidence solely presented at trial. This Court dismissed for cause all potential jurors, who were unable to be fair or impartial. The protections instituted by this Court were sufficient to preserve

16

the Appellant's right to a fair trial. Thus, this Court did not err in denying the Appellant's motion to change venue.

## SUFFICIENCY OF THE EVIDENCE

**A. Whether the evidence was insufficient as a matter of law to sustain a conviction on the charge of Drug Delivery Resulting in Death, where it is alleged that the Commonwealth failed to prove the requisite mens rea of malice and causation?[8]**

The standard of review regarding a sufficiency of the evidence claim requires a determination as to "whether the evidence, viewed in the light most favorable to the Commonwealth, is sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt." Commonwealth v. Laird, 988 A.2d 618, 624 (Pa. 2010) (citing Commonwealth v. Watkins, 843 A.2d 1203, 1211 (Pa. 2003)). See also, Commonwealth v. Rivera, 983 A.2d 1211, 1220 (Pa. 2009) (whether viewing all evidence and reasonable inferences viewed in favor of the Commonwealth as verdict winner establishes all elements of the offense beyond a reasonable doubt). The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of an appellate court to re-weigh the evidence and substitute judgment for that of the fact-finder. Moreover, the Commonwealth's burden may be met by wholly circumstantial evidence, and any doubt about the defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. Commonwealth v. Packer, 168 A.3d 161, 163 n.3 (Pa. 2017); Commonwealth v. Rodriguez, 141 A.3d 523, 525 (Pa. Super. 2016)(quoting Commonwealth v. Tarrach, 42 A.3d 342, 345 (Pa. Super.

---

[8] Listed as issue 2 in the Appellant's Concise Statement of Errors.

17

2012)); Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa. Super. 2001).

Existence of inconsistencies in witness testimony does not alone render evidence insufficient to support a verdict. Commonwealth v. Long, 624 A.2d 200, 208 (Pa. Super. 1993). The established facts and circumstances do not have to be absolutely incompatible with the defendant's innocence. Commonwealth v. Morales, 69 A.2d 1003, 1005 (Pa. Super. 1996).

A review of the record reveals that the Commonwealth established sufficient evidence to enable the fact-finder to conclude that all elements of Drug Delivery Resulting in Death, 18 Pa. C.S. §2506(a) were proven beyond a reasonable doubt. Therefore, the Appellant's sufficiency of the evidence on this charge must fail.

Drug Delivery Resulting in Death is defined in the Pennsylvania Criminal Code as: "a person commits murder of the third degree who administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled _ _ _ _ _ _ _ 13(a) (14) or (30) of the Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance."[9] See generally 18 Pa. C.S. §2506(a). Subsection (a) references the crime of third degree murder, which is defined as any killing with malice that is not first or second degree murder. DiStefano, at 582. Malice has been characterized as exhibiting an

---

[9] On September 6, 2011, the legislature amended the language in section 2506 to define the offense as "a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a), (14) or (30) of the Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance." In the present case, the Commonwealth alleged that the Appellant violated section 2506 in June 2011. Therefore, this Court's analysis reflects the standard prior to September 7, 2011. On September 6, 2011, the Legislature removed the phrase "[a] person commits murder of the third degree who ... [.]" 18 Pa.C.S.A. § 2506(a) (repealed Sept. 6, 2011), and substituted "[a] person commits a felony of the first degree if the person intentionally ..." 18 Pa.C.S.A. § 2506(a) (effective Sept. 6, 2011). A discussion of House Bill 396 (of April 27, 2011), makes it clear that the Legislature deliberately changed the wording to remove the *mens rea* of malice and did so with the intention of making it easier to convict and impose greater penalties on individuals who sold drugs when those drugs resulted in the death of another. *See* H. No. 29, 195 Sess., at 757–58 (Pa.2011).

18

"extreme indifference to human life," and "may be found to exist not only in an intentional killing, but also in an unintentional homicide where the perpetrator 'consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily harm.'" Commonwealth v. Gardner, 416 A.2d 1007, 1008 (Pa. 1980); Commonwealth v. Young, 431 A.2d 230, 232 (Pa. 1981). Malice consists of "a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty." Commonwealth v. Costa, 861 A.2d 358, 363 (Pa. Super. 2004); DiStefano, supra. Therefore, the applicable mental state for a conviction under 18 Pa. C.S. §2506(a is malice. Commonwealth v. Ludwig, 874 A.2d 623, 631 (Pa. Super. 2005).

Viewing the totality of the circumstance, the Commonwealth presented ample evidence that Appellant acted with malice. Tracy Kuczynski testified that she lived with her brother, Thomas Kromer. (N.T. September 28, 2015 p. 96). Recently, she noticed that her brother appeared confused, demonstrated memory deficits, and suffered many falls. Id. at 98, 107. She stated: "his mind was so messed that he just didn't know [ . . . ] he honestly didn't know he was taking pills [ . . . ] anybody that would see him would have known he was overmedicated." Id. at 99. Prior to his death, Ms. Kuczynski observed her brother suffer withdrawal symptoms that corresponded with him scheduling another appointment with the Appellant. Id. at 100-101. Lastly, Ms. Kuczynski testified that the Appellant did not provide her brother with any instructions or initiate safety mechanisms to ensure that her brother ingested his medications safely or within the therapeutic range. Id. at 111. David Kuczynski, Thomas Kromer's brother-in-law, testified that he drove Mr. Kromer to the Appellant's office on several occasions. He

19

stated: "I'd take him up there and he would walk in and she was not in, the secretary had given him the prescription and it [w]as usually five to seven days, sometimes ten days, he would get it refilled way before time." Id. at 115. Mr. Kuczynski explained that without seeing the Appellant, his brother-in-law obtained his prescription signed by the Appellant. Id. at 116, 120-121. Throughout the entirety of his testimony Mr. Kuczynski emphasized that his brother-in-law obtained his prescriptions at least seven to ten days earlier than the re-fill date, appeared "overmedicated," acted "like a junkie needing a fix," and had difficulty walking and talking. Id. at 115-117, 119,121-123. He stated: "he would just go get the prescription off of the receptionist or wherever it was, I don't know, nurse or whatever, and I'd take him to the Rite Aid and they would get it filled the same day which is, like I said, seven to ten days earlier [ . . . ] I can say that he had it filled way before it was time to be filled." Id. at 117. Finally, Mr. Kuczynski testified that on June 10, 2011, the day after his brother-in-law filled a Roxicodone prescription, he discovered his brother-in-law deceased in his bedroom. Id. at 118.

Accordingly, on June 10, 2011, Deputy Schuylkill County coroner, David Truskowsky arrived to Mr. Kromer's residence. Id. at 166-167. He described the procedures he utilized during an investigation, specifically the investigation of Mr. Kromer's death. Id. at 166-197. Deputy Truskowsky completed a coroner's "view report," and noted the presence of several prescription bottles near Mr. Kromer's body. Id. at 178-180. As a result, Deputy Truskowsky photographed all of the prescription bottles, examined the labels, and the contents, if any. Id. at 180-181. Deputy Truskowsky noticed the Appellant's name as the prescriber. Id. at 181. Specifically, Deputy Truskowsky recalled the Appellant's name on the following prescriptions:

20

Alprazolam, Lamotrig, Xanax, Prozac, as well as several indescribable prescriptions. **Id.** at 180-186. He also recalled Samuel Garloff's name as the prescriber on the following prescriptions: Seroquel, Oxycodone, as well as several indescribable prescriptions. **Id.** at 183-186. Deputy Truskowsky recognized one prescription bottle recovered in Mr. Kromer's bedroom labeled as "DISP for Roxicodone," with the ID number of "02478 0620019," dated June 6, 2011. **Id.** at 200. He verified: "This looks like the prescription that was written for Thomas Kromer by Dr. Tarapchak. It shows what it looks it says "Oxy" and then something, and it looks like maybe 30 milligrams, number 90." **Id.** at 201. Deputy Truskowsky also verified that although the bottle label indicated Samuel Garloff as the dispenser, the prescription itself lists Stephanie Tarapchak. **Id.**

Scott Rishel, long-term pharmacy manager at the Rite Aid Pharmacy in Ashland, Pennsylvania testified that "02478," represents the Ashland Rite Aid store number. (N.T. ~~...~~ Relative to the June 6, 2011 Oxycodone 30 milligram prescription, 90 tablets, 23 day supply, Mr. Rishel explained that the bottle label listed the wrong physician. **Id.** at 145. Mr. Rishel indicated that the June 6, 2011 prescription should have listed Stephanie Tarapchak, and mislabeled the prescriber as Samuel Garloff.[10] **Id.** at 145, 147-148. Finally, Mr. Rishel testified that Roxicodone is a brand name for the June 6, 2011 prescription,[11] and that Mr. Kromer filled the prescription five

---

[10] He described a computer program which allowed the pharmacist to choose the prescribing physician from a drop down box. The drop down box then stored prior prescribers specific to each patient so as to avoid typing the physician's name on multiple occasions. However, Mr. Rishel stated: "it led to things like this where if the wrong doctor was picked from that drop down and then the pharmacist didn't catch it when we're checking it, that the wrong doctor's name would have been on the prescription then [ . . . ] how we would have even picked Dr. Garloff because we had that drop down on our computer that kept, you know, the last two or three doctors on that drop down that the patient used before. But that's why it would have had that doctor's name instead of Tarapchak's name on it." (N.T. September 29, 2015 p. 146-147).

[11] He explained: "plain Oxycodone is Roxicodone." (N.T. September 29, 2015 p. 167).

21

(5) days prior to re-fill.[12] Id. at 148, 150. In addition, the June 6, 2011 prescription increased the dosage of Mr. Kromer's prior May 19, 2011 prescription from ten (10) milligrams of Oxycodone with Tylenol to thirty (30) milligrams of Oxycodone without Tylenol,[13] three times the strength of his previous prescription. Id. at 150-15, 175. Mr. Rishel noted that the "different strength or different medication," enabled Mr. Kromer to evade insurance restrictions and re-fill the prescription early. Id. at 170-171. Otherwise, if Mr. Kromer attempted to re-fill the May 19, 2011 prescription on June 6, 2011, his insurance would have rejected payment. Id.[14]

Importantly, Dr. Richard Bindie, who previously performed over 6,000 autopsies, performed an autopsy of Mr. Kromer on June 11, 2011. (N.T. October 1, 2015 p. 9, 11, 32). At the time of Mr. Kromer's death, his urine showed positive results for Benzodiazepines,[15] TCA,[16] Amphetamine,[17] and Oxycodone.[18] Id. at 17. With a reasonable degree of medical certainty, Dr. Bindie attributed Mr. Kromer's death to the "combined adverse effects of multiple drugs and a contributory factor of the heart enlargement." Id. at 27, 31, 43. He explained: "there certainly was enough drugs there

---

[12] Mr. Rishel explained that Mr. Kromer's May 19, 2011 Oxycodone prescription dispensed from Rite Aid should not have necessitated a re-fill by June 6, 2011. (N.T. September 29, 2015 p. 164). Mr. Kromer's May 19, 2011 prescription should have lasted until June 14, 2011. Id. at 170. Mr. Rishel stated: "Not enough days supply would have been used up on the 25 days supply for it to go through for that same medication." Id. at 171.

[13] Mr. Rishel stated: "It's going to be 120 milligrams of the Oxycodone compared to the other one taking it every 4 hours, 6 tablets a day, is 60 milligrams [ . . . ] it is double, you know, double the Oxycodone if they are taking, you know, the one, just the plain Oxycodone, 4 a day." (N.T. September 29, 2015 p. 166).

[14] Mr. Rishel testified: "it won't let the prescription go through for a narcotic until the day that the previous one was used up as far as just insurance is getting more stricter with people getting things filled early [ . . . ] they're not going to reimburse for the same medication if the person is coming in every other day to get something that should have lasted them 30 days [ . . . ] even too, if it's leading them to abuse of the medication, like why the person is even looking to get something refilled so much early, they must be not taking it the way it's prescribed by the physician." (N.T. September 29, 2015 p. 170-171).

[15] Dr. Bindie stated: "Benzodiazepines, which is like Alprazolam." (N.T. October 1, 2015 p. 17, 24).

[16] Dr. Bindie explained: "TCA, which is a psychiatric med [ . . . ] Quetiapine, that's Seroquel, that's for psychiatric condition [ . . . ] Prozac, that's a psychiatric drug also [ . . . ] Tricyclic. Anti-depressants. They are psychiatric meds. (N.T. October 1, 2015 p. 17, 22, 23, 38).

[17] Dr. Bindie stated: "Amphetamine is a speed." (N.T. October 1, 2015 p. 24).

[18] Dr. Bindie explained: "Oxycodone is a narcotic, an opiate [ . . . ] [Roxicodone] that's a trade name. The generic would be the Oxycontin." (N.T. October 1, 2015 p. 24, 45).

22

and when you mix drugs up you get this combined adverse effects of drugs and it makes all of the adverse effects of individual drugs present much worse than they are with that level [ . . . ] in other words, if there is a level of ten say, when they are all combined that level in blood of that particular drug could act like a drug with a level of the 50. They interact and it's dangerous to mix drugs." Id. at 28-27. Relative to the heart enlargement, Dr. Bindie opined: "You will die from the arrhythmia produced by the combination of all the drugs." Id. at 29. Meaning, that the combined adverse effect of multiple drugs "would make the heart start acting erratically."[19] Id. 29-30. Moreover, Dr. Bindie opined: "Opiates depress respirations and the oxygen in the blood is reduced and if a person has any coronary artery disease or any kind of heart that is predisposed to an arrhythmia, hypoxia would induce the arrhythmia in that patient." Id. at 31. Especially, in overdose, Dr. Bindie verified that Oxycodone can produce severe respiratory depression, hypertension, and cardiac arrest. Id. at 48-49

. . . . . . . . licensed since 1992, an expert in anesthesiology, specifically pain medicine and addiction, opined within a reasonable degree of medical certainty that the level of prescribed Oxycodone led to Mr. Kromer's death.[20] Id. at 55-56, 75, 81, 85-86, 112, 135. Upon review of the toxicology report, Dr. Thomas verified that Mr. Kromer's urine concentration showed a number of different chemical substances

---

[19] Dr. Bindie explained: "the heart problems, the left ventricular hypertrophy is associated with high blood pressure usually and it causes many adverse effects that could make you short of breath or increase your blood pressure or it could decrease oxygen in the blood and would cause the heart to go into arrhythmia [ . . . ] adverse effects of opiates, you get short of breath sometimes, depressed respirations, and if you have any kind of heart disease it needs oxygen." (N.T. October 1, 2015 p. 29-30).

[20] Dr. Thomas stated: "So the therapeutic range for Alprazolam tends to be in the range under --between 30 and 100 nanograms per ML. And this is in the therapeutic range, but the Oxycodone is in the super therapeutic range or the toxic range for that drug. In the absence of other reasons for Mr. Kromer to present as he did, one can say it was within a reasonable degree of medical certainty that the cause of his death was the combined toxicity of all of these drugs." (N.T. October 1, 2015 p. 81). He testified: "There was post-mortem that showed Oxycodone intoxication. There was pharmacy records that showed that he had been changed from 7.5 milligrams of Oxycodone with Apap to 10 milligrams of Oxycodone with Apap to Oxycodone 30 milligrams over the course of a 50 day period." Id. at 135.

23

within his system, wherein Oxycodone accounted for the highest concentration at a level of 300 nanograms per ML,[21] and Alprazolam accounted for 40 nanograms per ML. Id. at 78. He clarified: "Alprazolam [ . . . ] is generally not a drug that by itself will cause respiratory depression. However, it is important to understand that when Alprazolam is combined with an opioid, it acts on a different part of the system that keeps us breathing such that in therapeutic levels it can enhance the toxicity of opioids. Alprazolam acts to decrease the part of the brain that keeps us awake [ . . . ] When we combine the problem of not being awake with the problem of not responding to the normal signals that reach our brain to tell us to breathe, then we have a problem that can lead to profound respiratory depression and a spiral leading to death. Thus, the-having two different parts of the brain being suppressed by these drugs was the mechanism by which this death occurred [ . . . ] we know that there was one drug that was in toxic concentration, Oxycodone. We know that there was one drug that acted synergistically or in an additive [. . . that was in a therapeutic range,] Alprazolam. And we know that there were other drugs in lower concentrations, most of which were central nervous system depressants that also contributed to this central nervous system depression which led to his death." Id. at 78-79, 112. Dr. Thomas confirmed that the Appellant prescribed Mr. Kromer the Alprazolam and the Oxycodone on June 6, 2011. Id. at 79-80, 112.

After determining the medical cause of Mr. Kromer's death, Dr. Thomas opined at length that the Appellant's treatment was not reasonable and necessary or in accordance with the accepted treatment principles of any responsible segment of the

---

[21] Dr. Thomas stated: "The normal therapeutic concentration of Oxycodone is generally less than 100 nanograms per ML. At levels greater than 200 nanograms per ML, death has been known to occur [ . . . ] it is the finding of a level of Oxycodone that is in the range where death is known to occur in a susceptible individual; particularly in the presence of other drugs in the therapeutic range like the Alprazolam." (N.T. October 1, 2015 p. 81).

24

medical community. **Id.** at 51-110. He related that within the medical community, federal and state guidelines exist as to the use of prescribing opiates. **Id.** at 59. He commented that there is a wide variety of literature about the guidelines in practice as well as organizations that assist with guideline compliance. **Id.** at 59-60.

In Pennsylvania, regulatory guidelines describe the expectation of physicians, as well as evaluation and documentation of the use of all controlled substances, including opioids. **Id.** Dr. Thomas described a "model policy," utilized for controlled substances and chronic pain patients. **Id.** He stated: "documentation, the need for trial, the need to start low and go slow, the need to gradually, to repeatedly evaluate the patient to see what is the patient's response, are they achieving side effects, are they experiencing issues with the use of controlled substances [ . . . ] the need to both monitor the patient, to document the response [ . . . ] being clear on the balance of the risk of the drugs with the benefits." **Id.** at 60-61. Under the Pennsylvania Code, Dr. Thomas outlined the minimal activities expected of a physician. **Id.** at 66. Minimal activities include: initial history and physical examination, the development of a treatment plan, periodic re-evaluation of the responses, advising the patient of risks and benefits, maintaining adequate and complete medical records describing the physician's approach to prescription. **Id.** Dr. Thomas testified that the general precept is to administer the amount which produces the desired effect while minimizing the possibility of undesired effects. **Id.** at 83. He noted that because controlled substances are susceptible to overuse and abuse, it is crucial for a physician to ascertain why a patient is requesting another prescription prior to the expected date of re-fill. **Id.** at 91. Furthermore, he noted that if a physician were to change a prescription to avoid insurance regulation, the physician would not be in

25

accordance with the accepted treatment principles in a responsible segment of the medical community. Id. at 92.

In the present case, Dr. Thomas questioned Mr. Kromer's primary pain problem. He opined that in the treatment of a headache, opioids play a limited role, especially when a patient like Mr. Kromer suffers from several psychiatric diagnoses and chronic obstructive pulmonary disease. Id. at 97, 110. Dr. Thomas recognized that Mr. Kromer's complete medical record of seven (7) years treating with the Appellant totaled only two (2) pages in its entirety. In fact, one page solely regarded Mr. Kromer's death. He opined: "it is by every measure completely inadequate for the purpose of documenting his medical treatment. It contains no information that would – except for the fact that he got drugs—that would be required [ . . . ] it contains none of the medical decision making that would be required by the model policy for the use of controlled substances in the treatment of pain. It is not in any real sense a medical record." Id. at

Notwithstanding, Mr. Kromer's lacking medical record and absence of regular visitation or examination, Dr. Thomas observed that Mr. Kromer obtained medications and at an accelerating pace. Id. at 106-107. Dr. Thomas testified that the Appellant enabled Mr. Kromer to use his medication at an accelerated pace, instead of identifying a problem with Mr. Kromer's use. Id. at 107. Dr. Thomas opined that the Appellant's considerable increase in Mr. Kromer's previous dose "allowed him to continue to use the medication in an out of control fashion leading to his death." Id. at 107-108. He explained that each time Mr. Kromer ingested a pill under the new prescription, Mr. Kromer ingested three (3) times as much as when he ingested a pill every other time. Id.

26

at 109. Other than over prescribing practices, Dr. Thomas observed an absence of possible legitimate explanations. He related that nothing in Mr. Kromer's medical record showed the Appellant's decision making process to account for the change in prescription and increased dosage. Id. at 110, 114. As a result, Dr. Thomas opined that the Appellant failed to adequately evaluate the pattern of her own over prescribing. Id. at 114.

Finally, Dr. Thomas concluded to a reasonable degree of medical certainty that the Appellant's treatment in causing Mr. Kromer's death could have been prevented and demonstrated deliberate prescribing behavior as well as ignorance of Mr. Kromer's best interest. Id. at 109-110, 113. Dr. Thomas testified: "Given that the prescription was written at the request of the patient in her hand on her prescription pad and given to the patient deliberately in an attempt to bypass the restraint by the insurance company of paying for it, that was certainly no accident." Id. at 113. Dr. Thomas opined that the Appellant failed to protect Mr. Kromer from his addictive opioid consumption, and showed no consideration for the consequences of "her dramatic increase in the potency and dose." Id. at 114. The Appellant provided access "for a person who had clearly lost control in his consumption of opioids." Id. Dr. Thomas explained: "So we had someone [. . .] who was a person with known psychiatric disease using medication in an accelerated fashion, appearing to be rather disheveled, at least at the time of his death. And that the accelerating use of the medication was made possible only by [the Appellant's] prescribing. Id. at 107.

Accordingly, the Commonwealth presented six (6) witnesses, who established each of the elements of Drug Delivery Resulting in Death, 18 Pa. C.S. §2506(a) beyond a reasonable doubt. First, several witnesses including Deputy Coroner, David

27

Truskowsky, pharmacy manager Scott Rishel, and pain management expert, Dr. Thomas testified that the Appellant prescribed Mr. Kromer the June 6, 2011 Oxycodone.

Second, Scott Rishel, and Dr. Thomas testified that the Appellant prescribed an increased dosage and prescription, which was not in good faith or in accordance with treatment principles accepted by a responsible segment of the medical profession in violation of the Controlled Substance, Drug, Device, and Cosmetic Act. Specifically, Dr. Thomas testified that the Appellant failed to comply with the minimal activities outlined by the Pennsylvania Code for prescribing controlled substances. He noted that the Appellant failed to document any medical decision making regarding Mr. Kromer throughout his seven years as her a patient. Dr. Thomas testified that despite the Appellant's recognition of Mr. Kromer's apparent physical susceptibility as an individual, and apparent misuse/abuse of his opioid prescription, the Appellant enhanced the toxicity of his opioids and did nothing to minimize the fatal effects. Scott Rishel testified that Mr. Kromer's May 19, 2011 Oxycodone prescription should not have necessitated a re-fill prior to June 14, 2011. He recalled that on June 6, 2011, the Appellant prescribed an increased dosage and a different medication so as to enable Mr. Kromer to re-fill his prescription early, and evade insurance restrictions. He verified that if Mr. Kromer attempted to re-fill the May 19, 2011 Oxycodone prescription on June 6, 2011, his insurance would have rejected payment. Importantly, Mr. Rishel explained that if a person seeks to re-fill a prescription earlier than their supply expiration, then the person must be ingesting the prescription above the therapeutic range.

Third, forensic pathologist, Dr. Bindie, and pain management expert, Dr. Thomas, testified that Mr. Kromer died as a result of using the June 6, 2011 Oxycodone

28

prescription. Dr. Bindie testified within a reasonable degree of medical certainty that the combined adverse effects of the multiple drugs in Mr. Kromer's system induced depressed respiration and arrhythmia. Dr. Thomas testified within a reasonable degree of medical certainty that the normal therapeutic concentration of Oxycodone is less than 100 nanograms per ML and death has been known to occur in susceptible individuals at a level greater than 200 nanograms ML. In this case, Dr. Thomas noted that Mr. Kromer's urine concentration reflected Oxycodone at 300 nanograms ML, the highest concentration of any controlled substance within his system at death. Similar to Dr. Bindie, Dr. Thomas confirmed that the Alprazolam within the therapeutic range and the Oxycodone in the toxic range acted synergistically to cause respiratory depression and led to Mr. Kromer's death.

Finally, all six (6) witnesses testified that the Appellant acted with malice. Tracy and David Kuczynski testified that Mr. Kromer appeared overmedicated and disheveled. Mrs. Kuczynski noted that the Appellant failed to provide Mr. Kromer with instructions or safety mechanisms to prevent abuse and ensure that Mr. Kromer ingested his prescriptions within the therapeutic range. Mr. Kuczynski confirmed that the Appellant hardly ever examined or evaluated Mr. Kromer prior to filling his prescriptions. He also confirmed that Mr. Kromer re-filled his prescriptions at least seven to ten days earlier than his supply expiration. Scott Rishel corroborated that Mr. Kromer's May 19, 2011 Oxycodone prescription should have lasted until June 14, 2019. Instead, Mr. Rishell recalled that the Appellant increased the dosage of Mr. Kromer's prior prescription and changed the medication to Oxycodone without Tylenol. He explained the Appellant's modification enabled an early re-fill, evaded insurance restrictions, and represented an

29

increase three times the strength of his previous prescription. Dr. Bindie opined that a patient like Mr. Kromer, who is predisposed to arrhythmia and is prescribed opiates will experience adverse effects that could increase blood pressure or decrease oxygen and lead to cardiac arrest. He testified that an individual will die from arrhythmia produced by the combination of all the drugs that were present in Mr. Kromer's urine concentration at death. Lastly, Dr. Thomas testified that Mr. Kromer lacked a medical record, lacked regular visitation or examination, yet he obtained prescriptions from the Appellant at an accelerating pace. He observed that the Appellant enabled Mr. Kromer, a susceptible individual to misuse/abuse his prescriptions at a continuing and accelerated rate. Dr. Thomas concluded that the Appellant prescribed a toxic dosage of Oxycodone to Mr. Kromer for an underlying headache without any documented medical rationale in order to bypass Mr. Kromer's insurance safeguards. Dr. Thomas found that the Appellant's actions were anything but accidental and showed no consideration for the consequences of his prescriptions on Mr. Kromer, an individual she knew susceptible to psychiatric illness and arrhythmia consumed his opioids in a haphazard and reckless manner.

The Appellant's reliance on Commonwealth v. Ludwig, 874 A.2d 623 (Pa. Super. 2005) is misplaced. Unlike Ludwig, the record is replete with evidence that a high probability of death would result from Mr. Kromer's ingestion of the June 6, 2011 Oxycodone prescription. Also unlike Ludwig, the Appellant did not merely supply a potentially dangerous drug to Mr. Kromer, and the Commonwealth did not solely rely on the Appellant's delivery to establish malice.

In Ludwig, a teenage boy supplied two teenage girls a double dosage of ecstasy, resulting in the death of one teenage girl. The Ludwig Court held that without more, the

30

mere sale of drugs did not evidence wickedness, hardness of heart, cruelty, and re(k)lessness required for malice aforethought. Notwithstanding, the **Ludwig** Court analyzed five (5) factors relevant to a malice inquiry: (1) supplying another with an illegal and dangerous substance of unknown quality; (2) lack of knowledge of the recipient's reaction or tolerance to the drug; (3) the age of the recipients; (4) providing a drug in an amount twice its "normal" dosage; and (5) motivation by profit. **Id.** at 632. First Dr. Thomas testified that the Appellant prescribed Mr. Kromer a toxic range of Oxycodone where death has been known to occur in a susceptible individual, particularly in the presence of other drugs like Alprazolam. In this case, the increased dosage and potency of Oxycodone at the direction of the Appellant, where Mr. Kromer ingested three (3) times as much as when he ingested a pill every other day rises to the level of malice. Dr. Thomas recalled pharmacy records which showed that the Appellant modified Mr. Kromer's 7.5 milligrams of Oxycodone prescription with Apap to 10 milligrams of Oxycodone with Apap to Oxycodone 30 milligrams over the course of fifty days. Second, the Appellant as Mr. Kromer's primary care physician demonstrates knowledge as to Mr. Kromer's medical history and tolerance for the drug to support a finding of malice. Contrary to the teenage boy in **Ludwig**, it is reasonable to conclude that a physician knowing a patient's tolerance or possible reaction to a drug establishes the requisite wickedness, cruelty, recklessness, and disregard of social duty required for malice. The facts known to the Appellant include Mr. Kromer's headache pain, psychiatric diagnoses, and chronic obstructive pulmonary disease. Dr. Thomas testified that opioids play a limited role in the treatment of a headache, especially for a chronic period of time, and should not be utilized. (N.T. October 1, 2015 p. 124) Dr. George

31

Woody, the Commonwealth's drug dependency and drug diversion expert, emphasized the importance of understanding the tolerance of the individual so as to avoid overdose. He opined that the Appellant routinely prescribed high doses "without any clear evidence of tolerance on the part of the patient, which is dangerous." (N.T. September 28, 2015 p. 11, 25)

Additionally, Dr. Thomas testified that the Appellant prescribed Mr. Kromer Alprazolam, which by itself will not cause respiratory depression. However, when Alprazolam is combined with an opioid, the two drugs acting synergistically combined with lower concentrations of central nervous system depressants can lead to respiratory depression and death. Dr. Bindie explained that the combined adverse effects of multiple drugs would make a heart start acting erratically, and opiates would depress respirations inducing arrhythmia, especially if a person has a predisposition to arrhythmia. The evidence showed that prior to June 10, 2011, the Appellant conducted no examinations before writing prescriptions for Mr. Kromer. The Commonwealth presented the above expert testimony to establish that the lack of examinations and failure to maintain any type of medical record was not in accordance with treatment principles recognized by the medical community. In addition, the Appellant's conduct after June 10, 2011[22] when added to the other facts of this case, increasing the potency and dosage to bypass insurance regulations, showed that the prescriptions she wrote prior to that date were not

[22] The Commonwealth presented a recorded telephone conversation in which the Appellant admitted to increasing the dosage, and stated that Mr. Kromer previously tolerated the same medication in 2006. She also stated that she did not believe Oxycodone 90 to be a high dosage. Contrary to the Appellant's statements, Dr. Thomas testified that his review of Mr. Kromer's medical file did not indicate the Appellant prescribed the same medication in 2006. Moreover, as to the dosage increase, Dr. Thomas opined: "giving someone three times as much medicine is a considerable increase in dosage. 300 percent is 300 percent [. . .] 2,700 is significantly greater than the 1,500 that he had when he was given 150/10 milligram tablets." (N.T. October 1, 2015 p. 108).

32

made in good faith in the course of her professional practice. See Commonwealth v. Possinger, 399 A.2d 1077 (Pa. Super. 1979).

Relative to the third factor, the Commonwealth did not present any evidence that establishes malice because of Mr. Kromer's age. The fourth and fifth factors, providing a triple dosage of the drug and profit motive establishes hardness of heart, willful disregard, and an extreme indifference to the value of human life. Dr. Thomas testified that the Appellant's deliberate prescribing made Mr. Kromer's accelerated use possible. At the time of death, Mr. Kromer's medication list totaled thirty (30) different prescriptions. (N.T. September 28, 2015 p. 156). Dr. Thomas explained that the Appellant increased Mr. Kromer's prior dosage 300 percent and allowed him to continue to misuse his Oxycodone prescription in "an out of control fashion." Dr. Thomas opined that the Appellant bypassed insurance safeguards[23] in order to prescribe Mr. Kromer a dose of a drug that led to his death. He acknowledged that post-mortem showed Oxycodone intoxication. In fact, Oxycodone accounted for the highest concentration in Mr. Kromer's urine at a level of 300 nanograms per ML. There is no evidence to indicate that the Appellant cautioned Mr. Kromer. Mrs. Kuczynski testified that the Appellant did not provide Mr. Kromer with any instructions or employ any safety mechanisms to ensure the Appellant ingested his prescriptions safely. Nor did the Appellant maintain any medical record to show her decision-making process. Dr. Thomas and Scott Rishel explained that a physician must recognize when a patient is using more than expected and in a way that is not producing the desired result. Dr. Thomas indicated that there are several checks and balances, which prevent a patient from obtaining a prescription before

---

[23] Delton Bolton, the Appellant's former paramour testified that the Appellant made adjustments to the dosages of prescriptions in order to be able to have prescriptions paid by his insurance. (N.T. September 23, 2015 p. 208).

33

their supply expires. He opined that the first safeguard lies with the physician, who must ascertain why they need to re-fill a prescription earlier than expected and to document the reason in the medical record. The Appellant failed to undertake either pre-caution. The Appellant showed no concern for Mr. Kromer's well-being. In this case, the Appellant's increase in dosage and potency to guarantee insurance payment is indicative of a wickedness, hardness of heart, cruelty, and recklessness.

Based upon the above analysis, the Appellant demonstrated an extreme indifference to human life by continuing to prescribe Mr. Kromer opioids at an accelerated pace without adequately evaluating Mr. Kromer, without maintaining medical records or a prescribing rationale, showing no consideration for the consequences, despite her knowledge that Mr. Kromer consumed his opioid prescriptions in a haphazard and reckless manner, presented with several psychiatric diagnoses as well as chronic obstructive pulmonary disease, and possessed a predisposition for arrhythmia. On repeated occasions, Appellant consciously disregarded an unjustified and extremely high risk that her actions might cause serious bodily injury. In particular, she deliberately increased the potency and dosage so as to bypass the restraint of the insurance company. Accordingly, the jury's decision to convict the Appellant of third-degree murder is supported by sufficient evidence.

The Appellant also claims that the Commonwealth failed to prove that the June 6, 2011 Oxycodone caused Mr. Kromer's death citing a "but-for" test of causation. However, the Appellant does not cite any Pennsylvania case law that has found that a court cannot convict a person of drug delivery resulting in death in a case of mixed toxicity. In fact, a defendant's conduct need not be the only cause of the victim's death

34

in order to establish a causal connection. Criminal responsibility may be properly assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result. See Commonwealth v. Nunn, 947 A.2d 756, 760 (Pa. Super. 2008). A review of the evidence in the light most favorable to the Commonwealth, reveals that the Appellant's conduct satisfies the causation test. The Appellant's conduct was a direct and substantial factor in Mr. Kromer's death. A review of the pharmacy records reveals that on June 6, 2011, the Appellant prescribed Mr. Kromer 30 milligrams of Oxycodone without Tylenol, three times the strength of his previous prescription. Pain management expert, Dr. Thomas testified that Mr. Kromer died as a result of using the June 6, 2011 Oxycodone prescription. Notwithstanding the other substances within Mr. Kromer's urine concentration, the amount of Oxycodone ingested by Mr. Kromer was in the toxic range. Dr. Thomas testified within a reasonable degree of medical certainty that the

... of O... d... is less than 100 nanograms per ML and

death has been known to occur in susceptible individuals at a level greater than 200 nanograms ML. In this case, Dr. Thomas recognized Mr. Kromer as a susceptible individual, and noted that Mr. Kromer's urine concentration reflected Oxycodone at 300 nanograms ML, the highest concentration of any controlled substance within his system at death. Similar to Dr. Bindie, Dr. Thomas confirmed that the Alprazolam within the therapeutic range and the Oxycodone in the toxic range acted synergistically to cause respiratory depression and led to Mr. Kromer's death.

Therefore, the evidence at trial showed that but-for Mr. Kromer's ingesting the June 6, 2011 Oyxcodone, he would not have died. Moreover, it is foreseeable that if you

35

prescribe a susceptible patient, Oxycodone in the toxic range, that patient could die. Thus, the Commonwealth established sufficient evidence to demonstrate that Mr. Kromer died because he ingested Oxycodone supplied to him by the Appellant.

**B. Whether the evidence was insufficient as a matter of law to sustain a conviction on the charge of Corruption Organizations, where it is alleged that the Commonwealth failed to prove racketeering activity and that an enterprise existed?[24]**

As previously articulated above, appellate review of a challenge to the sufficiency of the evidence is well-established, and must be viewed in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow the jury to find every element beyond a reasonable doubt. **Commonwealth v. Tejada, 107 A.3d 788, 792-793 (Pa. Super. 2015)**. A review of the record reveals that the Commonwealth established sufficient evidence to enable the fact-finder to conclude that all elements of Corrupt Organizations, 18 Pa. C.S. §911(b)(2) were proven beyond a reasonable doubt. Therefore, the Appellant's sufficiency of the evidence claim as to this charge must fail.

The crime of corrupt organizations is codified at Section 911 of the Crimes Code, which provides, in relevant part:

> (b)(2) It shall be unlawful for any person through a pattern of racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.

Subsection (h) defines "enterprise" as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa. C.S.§911(h)(3). Further, the subsection lists numerous crimes that constitute "racketeering activity," including theft

---

[24] Listed as issue 3 in the Appellant's Concise Statement of Errors.

36

and insurance fraud, a violation of the Controlled Substance, Drug, Device, and Cosmetic Act relating to the sale and dispensing of narcotic drugs, and defines a "pattern of racketeering activity" as "a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section." 18 Pa. C.S. §§911(h)(1),(h)(4); See Commonwealth v. Stocker, 622 A.2d 333, 340 (Pa. Super. 1993)(holding that the Pennsylvania Corrupt Organizations Act, does not require that a defendant be convicted of the predicate crimes which constitute a pattern of racketeering activity, only that the Commonwealth specify and attempt to prove the elements of two or more predicate acts beyond a reasonable doubt). As cited above, the prohibited activities require that the jury find beyond a reasonable doubt, "a pattern of racketeering activity," and the Appellant's interest in an "enterprise." As such, the Commonwealth must prove three (3) elements: (1) that the Appellant's internal medicine practice was an "enterprise," (2) that the Appellant was associated or employed by the enterprise, and (3) ... constituted "a pattern of racketeering activity," that is two or more criminal acts such as Distributing Prescription to a Drug Dependent Person, and Insurance Fraud.

Viewing the totality of the circumstances, the Commonwealth presented ample evidence beyond a reasonable doubt that the Appellant's internal medicine practice in Ashland, Pennsylvania constituted a legitimate business entity engaged in commerce. The Appellant, Stephanie Tarapchak D.O. exhibited control of the distribution of narcotics to individuals in Ashland, Pennsylvania, through her internal medicine practice and fraudulently billed insurance companies involving various employees. And that through these employees, and the use of the Moore catalog, narcotics were delivered to

37

the Appellant's practice. The Appellant then distributed the narcotics to other individuals, including her former paramour, Delton Bolton. The evidence shows that Appellant controlled the process by which the drugs would be picked up and delivered, and that these transactions occurred over a period of time with the ultimate goal of dispensing narcotics and fraudulently billing insurance companies in Ashland, Pennsylvania. The Appellant controlled how the drugs were dispensed, and who had access. Therefore, the "enterprise," requirement of the Act is satisfied. Second, the Appellant is associated with the enterprise in question because the Appellant owned and operated the internal medicine practice from which she dispensed narcotics. See Commonwealth v. Rogal, 120 A.3d 994, (Pa. Super. 2015)(finding sufficient evidence to prove that defendant participated in racketeering activities as required for conviction of corrupt organizations where defendant owned and operated pain clinic, described himself as the doctor in charge, and submitted billing at a value ten times that of the procedures actually performed); Commonwealth v. Dellisanti, 876 A.2d 366 (Pa. Super. 2005)(holding that defendant was "associated" with Corrupt Organizations Act enterprise by virtue of her ownership of store from which drug paraphernalia was sold). Here, the Appellant is described as the individual, who ran the medical practice and exhibited knowledge and control of the practice's procedures. Further, the Appellant deposited all income, cash, check, or insurance payment derived from her medical practice into her personal bank account. All money garnered directly and solely benefited the Appellant.

Finally, the Commonwealth presented ample evidence beyond a reasonable doubt that the Appellant's actions met the requirements in that she participated in "racketeering activity." A person can commit "racketeering activity," by violating the Controlled

38

Substance, Drug, Device, and Cosmetic Act (relating to the sale and dispensing of narcotic drugs), 18 Pa. C.S. §911(h)(1)(ii). There was sufficient evidence to sustain the conviction of Distributing, Prescription to a Drug Dependent Person, 35 P.S. §780-113(a)(13). Section (a)(13) prohibits: "the sale, dispensing, distribution, prescription or gift by any practitioner [ . . . ] any controlled substance to any person known to such practitioner to be or whom such practitioner has reason to know is a drug dependent person, unless said drug is prescribed, administered, dispensed or given, for the cure or treatment of some malady other than drug dependency." The definition of drug dependent, "means a person who is using a drug, controlled substance or alcohol, and who is in a state of psychic or physical dependence, or both, arising from administration of that drug, controlled substance or alcohol on a continuing basis. Such dependence is characterized by behavioral and other responses which include a strong compulsion to take the drug, controlled substance or alcohol on a cotinuous basis in order to experience its psychic effects, or to avoid the discomfort of its absence. This definition shall include those persons commonly known as "drug addicts." 35 P.S. §780-102.

Delton Bolton, the Appellant's former paramour testified that he met the Appellant in late 2009, and began a relationship in early 2010. He testified that he "lived on and off," with the Appellant above her internal medicine practice in Ashland, Pennsylvania. (N.T. September 23, 2015 p. 179, 190, 193). Mr. Bolton explained that he became addicted to Percocet prescribed by the Appellant. Id. at 193. At this time, he recalled the Appellant ordering Vicodin, Benadryl, IV- Valium, Ketamine, Adipex, and testosterone through the Moore catalog. Id. at 193-196-197. Referring to the Moore catalog, Mr. Bolton stated: "she actually sat down with me and we used to go through it

39

together." Id. at 194. Also, at this time, he acknowledged transitioning away from street drugs as he "got wrapped up into the opiates." Id. at 196. Mr. Bolton testified that the Appellant ordered bottles of Vicodin through the Moore catalog. He stated: "she would just like circle things [ . . . ] write them down. And then, however she ordered it, I don't know how she ordered it [ . . . ] when she ordered the Vicodin, she would order Vicodin for the office. And then, there would be a bottle specifically for me right next to the bed stand that was my bottle. And explained to me [ . . . ] if I keep writing your prescriptions, with all the custody stuff she was going through and all the allegations [ . . . ] she decided just to get the Vicodin. That way, there's like 500 of them in the bottle [ . . . ] And they were like right in the bedroom for specifically for me." Id. at 198-199; (N.T. September 24, 2015 p. 35). Similarly, Mr. Bolton testified that throughout the whole relationship, the Appellant would routinely supply him with testosterone injections. Id. at 199; (N.T. September 24, 2015 p. 28-29, 117). Mr. Bolton described the progression [of his Vicodin addiction], and explained an exchange system with the Appellant, Id. at 211. He detailed that in exchange for providing Vicodin, the Appellant would prescribe him Ritalin and Adderall. Afterwards, Mr. Bolton "swapped out," the Ritalin and Adderall for his Vicodin. Mr. Bolton testified: "she would say, hey, I'll write this in your name, you give me it and I'll keep giving you your Vicodin." Id. at 212. He observed that the Appellant obtained the Vicodin from the Moore catalog. Id. at 213. Mr. Bolton testified that he ingested about fifteen (15) Vicodin daily. He stated: "and there would be a nightstand here and the bottle of Vicodin would be there. And every morning, I would wake up. I would eat five and get rolling. And then, I'd put 10 more in my pocket and go to work." (N.T. September 24, 2015 p. 36). Mr. Bolton indicated that the Vicodin

40

changed his behavior. He described irritability, highs and lows, as well as instability and drowsiness. Id.

Mr. Bolton portrayed a chaotic relationship with the Appellant, during which he became aware of his addiction, and felt compelled to remain in the relationship so as to continue his addiction. Id. In particular, Mr. Bolton recalled a traumatic incident wherein he ingested a near fatal dose of Adderall prescribed by the Appellant,[25] and became hospitalized in Saint Catherine's Hospital. Id. at 215-223. During his hospitalization, Mr. Bolton and the Appellant participated in therapeutic sessions regarding the Appellant's supply of narcotics. Id. at 220, 222. In fact, Dr. Babar Choudhry testified that he discussed the Appellant's medical treatment of Mr. Bolton. (N.T. September 30, 2015 p. 126). He stated: "a bigger concern was that Delton has taken medication that was prescribed by the family member [ . . . ] I mean it is against medical ethics. It is —every physician knows that it is against the core—especially in . . . . . . . . . . . . . . . supposed to be prescribed by a family member [ . . . ] upon the discharge [ we discussed] [ . . . ] the good medication that he was overdosing on and what was he using or abusing. We discussed about it and that was part of the conversation. Yes [ . . . ] she was in an agreement that she would not do this practice anymore." Id.

After his hospitalization, Mr. Bolton noted the Appellant supplied him Vicodin, and another addictive cycle commenced. Id. at 226. He stated: "she knew I was addicted to pills [ . . . ] every time we'd fight, I'd get sick and come back. She knew I was

---

[25] Delton Bolton testified that the Appellant prescribed him Adderall, however he never ingested the Adderall. He related that the Adderall prescriptions were solely for the Appellant's personal use. With the exception of his overdose, and attempted suicide, Mr. Bolton never ingested the Adderall. He recalled filling several Adderall prescriptions for the Appellant's personal use throughout their relationship. (N.T. September 24, 2015 p. 45-46).

41

addicted to pills.. That's why she'd always give me them. At one point, I think she did give me some Suboxone and then she cut me off from it. Because I was getting a little bit better." Id. at 227. Mr. Bolton explained that if the Appellant and him were fighting: "all medication would be completely deprived. I wouldn't have access to it at all." (N.T. September 24, 2015 p. 30). He verified multiple scripts written by the Appellant and identified the Appellant's handwriting on each script. (N.T. September 24, 2015 p. 44-49). On one occasion, Mr. Bolton recalled that the Appellant submitted an elderly patient's blood sample on behalf of Mr. Bolton in order to validate the testosterone scripts. Id. at 49-51.

In August 2011, while still addicted to approximately 150 milligrams of Vicodin, Mr. Bolton's relationship with the Appellant ended. At this time, the Appellant cut his access to Vicodin. (N.T. September 24, 2015 p. 13 -16).

Accordingly, the testimony of Delton Bolton indicates that the Appellant dispensed or prescribed quantities of Vicodin and testosterone to him throughout their two (2) year relationship utilizing the Moore catalog. He recognized the Moore catalog, and described in detail the manner in which the Appellant ordered the Vicodin, and designated the location of the Vicodin, on the nightstand. Mr. Bolton testified that he became a daily Vicodin user. He ingested fifteen (15) pills at one hundred and fifty (150) milligrams. Similarly, Mr. Bolton routinely employed testosterone injections. All controlled substances knowingly supplied by the Appellant, despite Mr. Bolton's apparent addiction. In fact, Mr. Bolton described the manner in which the Appellant surreptitiously provided an elderly patient's blood sample on behalf of Mr. Bolton, and increased the dosages of Adderall so as to bypass insurance regulations. Mr. Bolton

42

related that he suffered withdrawal symptoms when he fought with the Appellant, and the Appellant controlled his access. He felt manipulated and compelled to stay with the Appellant so as to feed his addiction. He testified: "our relationship was very co-dependent [ . . . ] I was sick of being dependent on the medicine [ . . . ] I wanted to be able to wake up and not have to [ . . . ] need 5 Vic 10's to function to go to work [ . . . ] and it didn't happen. She dangled that out there. And then next thing you know, I'm taking them and I'm in a vicious cycle again." (N.T. September 23, 2015 p. 226). Mr. Bolton verified the Appellant's awareness of his addiction, and admitted that they discussed his addiction on several occasions. Dr. Choudhry confirmed the Appellant's awareness of Mr. Bolton's addiction, and testified that the Appellant became a part of his discharge plan. Dr. Choudhry warned the Appellant to discontinue the psychiatric and pain medication prescriptions. (September 30, 2015 p. 135).

A person can also commit "racketeering activity," by committing Insurance Fraud. 18 Pa. C.S. §911(h)(1)(i). There was sufficient evidence to sustain the conviction of Insurance Fraud, **18 Pa. C.S. §4117(a)(2)**. A person commits insurance fraud "knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim." **18 Pa. C.S. §4117(a)(2).** Under the insurance fraud statute, it is not necessary that the defendant personally submit a false claim, rather it is sufficient to "cause to be presented [ . . . ] any statement forming a part of, or in support of, a claim that contains false, incomplete, or misleading information." **18 Pa. C.S. §4117(a)(2)** or "knowingly benefits, directly or indirectly, from the proceeds

43

derived from a violation of this section due to the assistance [ . . . ] of any person." 18 Pa. C.S. §4117(a)(5). Thus, it does not matter whether the defendant personally submitted the false claims or had someone else do so. The statute contemplates both direct or indirect conduct.

In the present case, the Appellant intentionally and systematically used improper billing codes to collect higher insurance payments for procedures and examinations never performed in her internal medicine practice. The Appellant owned and operated a small internal medicine practice in Ashland, Pennsylvania. She supervised the employees, while Kelly McDonald, the office manager, and her former paramour Ricky White ran the billing department.

Ricky White testified that he met the Appellant in 2005, and dated the Appellant for approximately three (3) years. (N.T. September 30, 2015 p. 4). During their relationship, Mr. White became intimately familiar with the Appellant's medical practice and her billing department. Id. at 4,7. He assisted with the Medicare/Medicaid section of her billing department. Id. at 10. Mr. White testified that he became familiar with the codes "99215," and "99214." Id. at 11. He indicated that the Appellant instructed him to use code "99215," because in her words "everybody was a 99215." Id. at 11-12. Mr. White explained: "Everybody was a 99215 because that was the maximum amount of money that you could be paid for an office visit [ . . . ] the co-pay was only $3. And sometimes they couldn't afford the $3. And she said she was getting her money, she was getting paid." Id. at 12. Ultimately, the Appellant maintained control. He stated: "Stephanie knew how to bill [ . . . ] she controlled everything." Id. at 13-14. Furthermore, he recalled that while Kelly McDonald and Karen Mervine processed the

44

billing, the Appellant knew how to bill. He remarked: "she stated to me that she owns her own business, she owns her own company, she needs to know everything about what's going on in the office and she too knew how to bill." Id. at 47.

In addition, Mr. White recognized that during his relationship with the Appellant, the Appellant submitted bills to his personal insurance company. He recalled receiving several explanation of benefits letters, detailing the billing date, the procedure received, and the amount covered by the insurance company. Id. at 14. Upon review, Mr. White discovered that he never received any procedures nor attended office visits listed in the letters. Id. at 15. He testified: "there were visits there [ . . . ] that I wasn't there for." Id. at 16. As a result, Mr. White began documenting the false service dates as well as dates that the Appellant double or triple billed, and re-billed. To that end, Mr. White explained several explanation of benefits letter, in which he documented that he never attended a visit or had been billed for the same service twice. Id. at 17-40. None of the explanation of benefits letters corresponded with legitimate services, yet the checks from his insurance company would be transferred directly to the Appellant. Id. at 50. He testified at length as follows:

> Q: And you mentioned on your writing down here that this is a Saturday. That would be March 15th of 2008?
>
> A: Yes.
>
> Q: And I'm showing you what I've marked Commonwealth's Exhibit 426, that's a calendar for the year 2008?
>
> A: Yes.
>
> Q: And looking at March 15th, what is the actual day of the week?
>
> A: It's a Saturday.

45

Q: And Commonwealth's Exhibit 427, what is the dates of service for that?

A: 4/8 of '08.

Q: And again, what is your writing on the bottom?

A: "This is a Sunday. I'm on paternity leave and the baby was just born on the 2nd."

Q: And again, Commonwealth's Exhibit 428, is that the same explanation of benefits and the same services?

A: Yes.

Q: And is the difference the date received and completed on the right-hand side?

A: Yes.

Q: And what is the date received and completed?

A: July 7th of 2010.

Q: And again, the check is paid to Dr. Stephanie Tarapchak?

A: Yes.

Q: And Commonwealth's Exhibit 429, what's the date of service on that?

A: 4/15 of '08.

Q: And what is your handwritten notes on the bottom?

A: It says, "I'm on paternity leave from work and working at the high school all morning. Then, babysat in the afternoon."

Q: And going to the actual billing on that one, the first billing is for office visit by general practitioner, is that correct?

A: Yes.

Q: And the second one is prolonged service, OP?

A: Yes.

46

Q: And again, did you ever have an appointment or see the defendant at that time?

A: No.

Q: Showing you what's marked as Commonwealth's Exhibit 430, what is the date of service on that?

A: 4/15 of '08

Q: And again, what are your notes on the bottom?

A: "I'm on paternity leave from work. I worked at the school all morning. And I babysat in the afternoon."

Q: And you didn't see the defendant at all that day for any office visit?

A: No.

Q: Commonwealth's Exhibit 431, what's the date of services?

A: 5/5 of '08.

Q: And again, what is your handwriting on the bottom?

A: "Paternity leave and working at the school."

Q: And Commonwealth's Exhibit 432, is that the same explanation of benefits?

A: Yes.

Q: And what is the received and completed dates?

A: July 7th of 2010.

[ . . .]

Q: And there was a point in time after June 9th that you and the defendant were to have no contact with each other?

A: Yes.

47

Q: And when you received an explanation of benefits, were there explanation of benefits for office visits that occurred after June 9th when you were supposed to not have any contact?

A: Yes.

[ . . .]

Q: Alright, so those were all for things that didn't occur to you and visits that didn't happen?

A: That's correct.

Id. at 35-40, 51.

In the same way, Thomas Biscoe, a former patient testified that in 2008 he requested a physician's note to return to work. He recalled that the Appellant did not perform any examination. Id. at 116. Later, Mr. Biscoe received an "inflated" bill approximately $500.00. Id. at 117-118.

Importantly, Kelly McDonald, office manager, testified that the Appellant marked the patient's super bill with a code. Id. at 60. She indicated that she would bill the code as marked by the Appellant, and did not have the authority or knowledge to modify the super bill. Id. at 61. In fact, Ms. McDonald emphasized that she had no involvement in the diagnosis to be able to "code it." Id. She testified that the code originated with the Appellant. Id. She stated: "I was billing at the number that was written on the super bill. Whatever was on the super bill is what was billed." Id. at 98-99.

Furthermore, after submission of the super bill, Ms. McDonald related that Blue Cross and Blue Shield electronically transferred payment into the Appellant's personal bank account. She testified that the Appellant did not utilize a separate business account. Id. at 59-60, 71. Ms. McDonald explained that she kept the co-pay cash and the co-pay checks in a ziplock pouch until the end of the day when she placed the cash and checks in

48

a purple folder. The Appellant knew the folder's location, and the contents of the folder would be retrieved by the Appellant later that day. Id. at 72.

Subsequently, Ms. McDonald recalled an audit and explanation by an insurance representative, Dorothy Berg. Ms. Berg notified that the billing codes were being billed at the highest level, 99125, and reflected billing for services that the practice could not provide, meaning the practice lacked the proper equipment as well as maintained medical files with no documentation. Ms. McDonald testified that the Appellant routinely billed at 99215, 99214, and directed services be billed regardless of lack of equipment. Id. at 69, 99. Lastly, Ms. McDonald testified that after the audit occurred, specifically in 2011, the Appellant continued to bill at 99214, and continued to bill without documentation in the medical file. Id. at 109-110. She stated: "Whatever it was marked at, that's what it was billed at." Id. at 110.

Dorothy Berg, a clinical investigator for Capital Blue Cross testified that her responsibilities involved reviewing claims for fraud, waste and abuse, or potential fraud, waste and abuse. (N.T. September 23, 2015 p. 69). As part of her role, Ms. Berg opened an investigation against the Appellant's practice in 2009 due to "odd billings." Id. at 74, 76. She indicated that the Appellant's practice received a warning/educational correspondence citing excessive high billing of 92214[26] and 92215, [27] the highest levels of office visit as well as notification of an improper code for the administration of Lidocaine. Id. at 75-76. The correspondence notified the Appellant that "she stood as an outlier reporting a higher level of services than her peers." Id. at 119.

---

[26] Dorothy Berg explained that code 99214 triggered a charge amount of $125.00. (N.T. September 23, 2015 p. 115).

[27] Dorothy Berg explained that code 99215 triggered a charge amount of $200.00. (N.T. September 23, 2015 p. 115).

49

As part of the investigation, Ms. Berg conducted a review of the Appellant's claims history, and prepared a medical record request. Id. at 78. She observed several red flags in the Appellant's claims history. She explained: "high codes for the evaluation and management, so if we saw a patient with a lot of 99215's and then we looked at the patient's claim history and we weren't seeing admissions, we weren't seeing other referrals, that was a red flag [ . . . ] we saw some other oddities. For example, there was a code for what would have been a VQ scan that's like a nuclear medicine test. We felt pretty confident that was not being done in the physician's office [ . . .] because it's a nuclear medicine. You have to inject a dye and then you follow-up with a scan." Id. 79-80. Ms. Berg also recalled that the Appellant's claims history reflected prolonged visits of seventy (70) minutes, which is unusual for a family practitioner. Id. at 81. As a result, Ms. Berg notified the Appellant of an on-site inspection. During the on-site inspection, Ms. Berg expressed concern over the Appellant's documentation. She observed incomplete files. Id. at 90. She testified: "so as I'm looking at these records and I'm seeing no detailed information that if I didn't know the patient I wouldn't be able to pick it up, if I were a physician, and take care of the patient [ . . . ] only a date was on the document. There were no other markings. Id. at 91, 93, 96. Ms. Berg recounted that if the Appellant were billing at 99214, the corresponding expectation is detailed responses,[28] a referral to a specialist, or order for physical therapy or X-Ray. Id. at 95-96. Especially with a 99214 code and compared to the Appellant's pharmacy records, Ms. Berg explained: "I would expect to see where that was a fairly detailed exam history and that the medical decision making was of a detailed nature." Id. at 96. Here, the

[28] For example, Ms. Berg reviewed patient Peter Yawormicky's file and found only the date, 1/19/11, with no further entries. (September 23, 2015 p. 125). She explained that medical decision making in a medical file should include patient history, an examination, impression, and then a plan. Id. at 126.

50

Appellant's progress notes only indicated the date, and included inconsistent dates or pre-dated services with no justification for prescriptions.[29] Id. at 96-97,117. Also during the on-site inspection, Ms. Berg observed the lack of equipment necessary to perform the medical testing previously billed by the Appellant's practice. Id. at 99. Therefore, Ms. Berg found that the Appellant utilized a higher code than the level of service documented. Id. at 118. In conclusion, Ms. Berg found that the Appellant created the medical records to satisfy the audit. Id. Her conclusion required a second visit to the Appellant's practice. Ms. Berg recalled that the Appellant answered questions vaguely, and feigned laziness with recording vitals if a patient presented stable. Id. at 103, 108. Ultimately, Ms. Berg determined that based upon the claims with medical records available for review,[30] the Appellant overbilled $24,504.41. Id. at 119, 130,133. After the audit, Ms. Berg testified that the Appellant's incomplete progress notes continued, in particular the Appellant provided no basis for the medications she prescribed. Id. at 127,129.

Accordingly, the testimony of Ricky White, Kelly McDonald, and Dorothy Berg established beyond a reasonable doubt that the Appellant intentionally and knowingly misrepresented to Capital Blue Cross, an insurance provider, the facts of submitted claims in that her supporting medical records were incomplete, failed to substantiate the

---

[29] Dr Woody testified that he reviewed seven (7) of the Appellant's medical records and offered an opinion as to he whether the Appellant prescribed according to accepted medical standards. He stated: "Overall, there was a lot of prescriptions written for controlled substances; opiates, and stimulants [ . . . ] and I did not see any clear justification for prescribing these substances. There was no clear data that would establish a diagnosis that would justify the prescribing of [ . . . ] opiates and stimulants that were being prescribed [ . . . ] there was no record on the nature of the injury or documentation that he needed such a high dose of opioid doses on a chronic basis [ . . . ] no clear documentation. Particular over such a long period of time. And particularly, such high doses." (September 28, 2015 p. 13 -21). He confirmed that typically a physician documents some detail about the patient's response to treatment, anything relevant to clinical management, especially an operative note or some new occurence, however the Appellant maintained blank files, lacking all documentation. Id. at 60-61,67-73.

[30] Ms. Berg clarified that the audit only reviewed over thirty(30) records, and did not encompass the entirety of the Appellant's patients. (N.T. September 23, 2015 p. 120-121).

51

highest level of billing code, and failed to substantiate that services were even provided. Dorothy Berg testified that the insurance company relied on the Appellant's misrepresentations as material information necessary to process payment. All three (3) witnesses testified that the Appellant always billed using codes 99214 or 99215 and billed the same treatments for the same patient on multiple occasions. Ricky White testified that the Appellant submitted false claims with the intent to defraud the insurance company, in that the Appellant billed, and re-billed for treatments knowing that the treatments never occurred. Mr. White clarified multiple explanation of benefits letters listing dates of services that made his presence or her presence clearly impossible. Conspicuously, the Appellant billed for dates of services, which included: a few days after giving birth, during a scheduled court appearance, and while Mr. White and the Appellant were court ordered to have no contact as well as days Mr. White worked. Both Kelly McDonald and Mr. White testified that the Appellant held intimate knowledge of the billing practice, refused to outsource the billing, and retained control over and complicity with the fraudulent claims.

Similarly, Ms. Berg indicated that Capital Blue Cross began flagging claims submitted by the Appellant's medical practice. In 2008 and 2009, Capital Blue Cross notified the Appellant's practice of its improper 99215 coding versus the procedures actually performed. Although Capital Blue Cross and Ms. Berg informed the Appellant of the coding problem, the Appellant's medical practice continued to bill at 92214 and 92215 codes without complete medication documentation. Ms. Berg testified that she discussed the use of the incorrect code with the Appellant and provided alternative codes to office manager Kelly McDonald, however despite being advised, Capital Blue Cross

52

received subsequent claims in 2011 with the code 92215 lacking any documentation on the patient's progress note.

Based upon the foregoing, the Commonwealth presented sufficient evidence to support the Appellant's Corrupt Organizations conviction beyond a reasonable doubt. The Corrupt Organizations statute proclaims it unlawful to acquire or maintain "directly or indirectly," an interest through a pattern of racketeering activity. 18 Pa. C.S. §911(b)(2). Here, the Commonwealth presented evidence that directly and indirectly linked the Appellant to a pattern of racketeering activity. Mr. White, and Ms. McDonald as well as several other Commonwealth witnesses employed by the Appellant confirmed that the Appellant "controlled" her internal medicine practice. Moreover, based upon Ms. Berg's testimony, the jury could infer the Appellant's awareness of the billing issues and lack of documentation as well as the insurance company's warnings and request for off-set re-payment. Ms. Berg's testimony indicated that the Appellant acquiesced in the

¹ ⁱ⁻⁻ ⁻ when her practice continued to bill Capital Blue Cross even after being instructed to stop. Although Kelly McDonald, Karen Mervine, and Ricky White assisted with the billing department, none of those employees were the doctor. Therefore, it is reasonable to infer that the employees consulted the Appellant regarding any medical questions about the billing. See Commonwealth v. Rogal, 120 A.3d 994, 1003-1004 (Pa. Super. 2015). In addition, Mr. Bolton's testimony revealed that although he suffered an apparent drug addiction, the Appellant supplied him with high doses of Vicodin and testosterone ordered through the Moore catalog without justification or documentation for these prescriptions. Therefore, the Appellant either directly or

53

indirectly participated in a pattern of racketeering activity through the two predicate acts of Insurance Fraud, and Distributing Prescription to Drug Dependent Person.

The two predicate acts formed a pattern related to the enterprise in that the Appellant used the resources of her medical practice to acquire and maintain through the Moore catalog an inventory of narcotics. She utilized this inventory to supply Viocodin to her drug addicted paramour without a prescription so as to avoid insurance regulations and criminal investigation. She further used the resources of the enterprise, including the labor of her employees, and unwitting patients to receive income from insurance companies and funnel the income to herself under the guise of legitimate income. The Appellate engaged in illegal commerce on an ongoing regular basis, supplying patients with excessive opioid prescriptions without conducting examinations, or documenting her medical decision making, yet fraudulently billing insurance companies as if she did. The intertwining of her medical practice, fraudulent billing and narcotics supply is substantial. But for her medical practice, the Appellant would have to develop a completely different method of obtaining and supplying narcotics as well as income. Commerce at the Appellant's medical practice encompassed both legal and illegal sources of income. The Appellant's corrupt organization enabled her to generate direct and indirect revenues that were unavailable to other medical practices. The flow of patients arising from the easy access to excessive narcotic prescriptions, and other items purchased by the Appellant through the Moore catalog provided the Appellant with an unfair edge in commercial competition. The Appellant's regular use of an otherwise legitimate business to engage in illegal conduct is precisely a corrupt organization under Pennsylvania law.

Accordingly, the Appellant's conviction under 18 Pa. C.S. §911(b)(2) should be affirmed.

## EVIDENCE

A. Whether the trial court erred and committed an abuse of discretion, where it is alleged that the trial court allowed the substance of text messages and Facebook messages to be admitted during the testimony of James Hischar without foundational evidence that the Appellant authored the messages?[31]

The trial court's decision to admit evidence is subject to the following standard of review: "only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." Commonwealth v. Ballard, 80 A.3d 380, 392 (Pa. 2013). An abuse of discretion is not merely an error in judgment, but misapplication of the law, or judgment that is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. Commonwealth v. Stollar, 2014 WL 241864 * 15 (Pa. 2014); Commonwealth v. Moser, 999 A.2d 602, 605 (Pa. Super. 2010).

Pennsylvania Rule of Evidence 901, provides that authentication is required prior to admission of evidence. The proponent of the evidence must introduce sufficient evidence that the matter is what it purports to be. Pa. R. E. 901(a). Testimony of a witness with personal knowledge that a matter is what it is claimed to be can be sufficient. Pa. R. E. 901(b)(1). See also comment, citing Commonwealth v. Hudson, 414 A.2d 1381 (Pa. 1980). Furthermore, electronic writings typically show their source, so they can be authenticated by contents in the same way that a communication by postal mail can be authenticated. Circumstantial evidence may suffice where the circumstances support a finding that the writing is genuine. In the Interest, F.P., a Minor, 878 A.2d 91 (Pa. Super. 2005). Importantly, in In the

---

[31] Listed as issue 1 in the Appellant's Concise Statement of Errors.

Interest, F.P., a Minor. supra the Pennsylvania Superior Court rejected the argument that emails or text messages are inherently unreliable due to their relative anonymity and the difficulty in connecting them to their author. Id. at 95. Instead, the Pennsylvania Superior Court held that such evidence is to be evaluated on a case-by-case basis as any other document to determine whether there has been an adequate foundational showing of its relevance and authenticity. Authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required. Id. For example, circumstantial or direct evidence such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender. Commonwealth v. Mangel, 181 A.3d 1154, 1162 (Pa. Super. 2018); See also Commonwealth v. Koch, 39 A.2d 996 (Pa. Super. 2011)

In the instant case, the Commonwealth's witnesses provided ample circumstantial and direct evidence to meet the threshold for admission of the text messages and Facebook messages against the Appellant. During the testimony of Agent James Hischar, and Delton Bolton, the Commonwealth introduced the Appellant's text messages and Facebook messages. Agent Hischar testified to several facts suggesting the Appellant's ownership of the relevant text messages and Facebook messages. Agent Hischar testified that he met with the Appellant's former paramour, Delton Bolton, who submitted his cell phone for forensic examination. (N.T. September 22, 2015 p. 98; N.T. September 24, 2015 p. 52). Through forensic extraction, Agent

56

Hischar observed several text messages and photographs on Mr. Bolton's cell phone. Id. at 103-104. Agent Hischar explained that the forensic extraction separates received and sent text messages. Id. at 108-109. He verified that Mr. Bolton received text messages from the Appellant's cell phone number, and that Mr. Bolton responded to messages received from the Appellant's cell phone, that the number, in fact belonged to the cell phone that the Appellant owned. During the text conversation, the Appellant referenced smuggling or "boffing," her "robin's egg stash" into the county prison, which coincided with the timing of the Appellant's incarceration. Agent Hischar corroborated that "robin's egg," meant the Phentermine/Adipex pills, which matched the Appellant's Moore catalog invoice. The text conversation also addressed and questioned previous circumstances or interactions personal to the Appellant, Mr. Bolton, and her child. The text conversation mentioned "London's toy." Agent Hischar testified that "London," is the Appellant's daughter. Lastly, Agent Hischar attended a custody hearing in Lackawanna County, wherein the Appellant's attorney verified the Appellant's cell phone number as the same number observed on Mr. Bolton's phone, and the same number in text conversation with Mr. Bolton. (N.T. September 22, 2015 p. 107, 105, 110-112, 109, 138, 168-169). Furthermore, the Commonwealth presented testimony from Mr. Bolton, who directly received the Appellant's text messages. He confirmed that he often texted the Appellant, and likewise he often received texts from the Appellant. He identified the Appellant's cell phone number. Mr. Bolton confirmed that the Appellant texted him about smuggling adipex in her anal cavity while incarcerated. He explained the terms "robin's egg," and "boofed" relative to the

57

conversation, which corroborated that the messages being sent were being sent by the Appellant. (N.T. September 24, 2015 p. 5-6, 53-55).

Thus, direct and circumstantial evidence established that the Appellant authored the text messages admitted at trial. The personal information that Agent Hischar and Mr. Bolton each confirmed during their testimony corresponded to the Appellant's personal details interspersed throughout the conversations. Moreover, this Court provided the Appellant ample opportunity to cross-examine Agent Hischar and Mr. Bolton about the accuracy and validity of the text messages. This Court did not abuse its discretion in rendering this evidentiary ruling.

Equally, this Court did not abuse its discretion as to the admission of the Appellant's Facebook messages. The Commonwealth presented evidence substantiating that Appellant owned the Facebook account in question, and authored the messages. Agent Hischar executed a search warrant on the Facebook account, and testified that the creation of the Facebook account and messages coincided with a time period in which a court order precluded the Appellant from unsupervised communicated with her children. As such, Agent Hischar testified that the Appellant created a sham Facebook account under the guise of "Corrine Hartford," to avoid the court order and communicate with her children unsupervised. (N.T. September 22, 2015 p. 114-115). Additionally, Mr. Bolton provided Agent Hischar with photographs of Facebook messages. Id. 115-116. Agent Hischar testified that the search warrant results duplicated the photographs provided by Mr. Bolton. Id. 116, 118, 119, 164-165. The search warrant revealed account numbers specific to the following account names and authors: Stephanie Tarapchak, Corrine Hartford, Fallon

58

Tarapchak, and London White. Id. at 119, 171-172. Each of the Facebook messages contained contextual clues and distinct characteristics that linked the Appellant as the author of the messages. The Facebook messages expressed consistent themes about the specific custody circumstances, encouraging communication at any time "without Danielle creeping," including instructions about deleting messages as well as themes about prescribing or supplying medicine, and attending medical license classes. Id. at 122, 124-127. The messages used names or variations of names common to the Appellant and known among her children, such as the guardian ad litem's name, "Danielle," the Harry Potter character, "Hermione," the sham account name "Corrine Hartford," and the email address "Urmom1818@gmail.com." Id. at 122-123, 134. Specifically, the messages reference or address all of the Appellant's daughters, "London," "Ashtyn," and "Fallon." Independently, Agent Hischar attended a Lackawanna County custody ~~... ... ... of the Facebook messages.~~ Id. at 175. During the hearing, he recalled that the Appellant admitted to creating a sham Facebook account, under the guise of Corrine Hartford to secretly communicate with her children in contradiction of the court order. Id.

The Commonwealth introduced subsequent testimony from Mr. Bolton, a knowledgeable party to substantiate the Facebook account and by association, the Facebook messages. Mr. Bolton testified that he often communicated with the Appellant through Facebook. (N.T. September 24, 2015 p. 58). He related that the Appellant created a sham Facebook account with her older children as a means to sidestep the supervised contact custody provision. Id. at 59, 61. In fact, the

59

Appellant admitted to Mr. Bolton that she used the sham account to communicate. Id. at 62-63. Lastly, Mr. Bolton explained that the Appellant utilized "Hermione" because the family enjoyed Harry Potter. Similarly, the Appellant utilized the name, "Corrine" because her niece is named Corrine. Id. at 68, 95. Therefore, the contextual clues in the Facebook messages taken together with the testimony provided by Mr. Bolton support the conclusion that the Appellant created and authored the Facebook messages. Therefore, this Court properly admitted the substance of text messages and Facebook messages.

## RULE 404. CHARACTER EVIDENCE. CRIME OR OTHER ACTS

The Pennsylvania Rules of Evidence provide:

(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa. R. E. 404(b)(1),(2); See generally Commonwealth v. Lark, 543 A.2d 491, 497 (Pa. 1998)(evidence of other crimes, while generally not admissible solely to show criminal propensity, may be admissible in special circumstances where relevant for some other legitimate purpose; one special circumstance is "res gestae " exception, where such evidence became part of history of case and formed part of natural development of facts). In determining whether evidence of other prior bad acts is admissible, the trial

60

court is obliged to balance the probative value of such evidence against its prejudicial impact. Commonwealth v. Powell, 956 A.2d 406, 419 (Pa. 2008); Commonwealth v. Sherwood, 982 A.2d 483, 497 (Pa. 2009); Commonwealth v. Dillon, 925 A.2d 131, 141 (Pa. 2007)(stating that "[e]vidence will not be prohibited merely because it is harmful to the defendant").

In reviewing a trial court's discretion in evidentiary issues, the standard of review is as follows:

> [q]uestions regarding the admission of evidence are left to the sound discretion of the trial court, and [ . . . ] an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment; rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record

Commonwealth v. Richard, 150 A.3d 504, 512 (Pa. Super. 2016). The following subsections address the Appellant's challenges to this Court's admission of evidence.

A. Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it is alleged that the trial court allowed the testimony of James Hischar regarding the prescription the Appellant provided her daughter, and the daughter's subsequent overdose?[32]

First, the Appellant failed to timely object to Agent Hischar's overdose testimony. Therefore, the Appellant's challenge is waived. See Pa. R. A. P. 302(a); Commonwealth v. May, 887 A.2d 750, 758 (Pa. 2005); Commonwealth v. Brown, 359 A.2d 393 (Pa. 1976)(holding that the lack of a timely objection waived issue for appellate review). The Appellant is not entitled to relief. Notwithstanding, prior bad acts

---

[32] Listed as issue 6 in the Appellant's Concise Statement of Errors.

61

evidence may be admissible as *res gestae* when relevant to furnish the complete story or context of events surrounding the crime. See Commonwealth v. Williams, 896 A.2d 523, 539 (Pa. 2006); Commonwealth v. Paddy, 800 A.2d 294, 308 (Pa. 2002). Agent Hischar testified that his investigation uncovered the following: "Fallon is her eldest daughter, I believe at the time was probably about 15. She had overdosed of Xanax, that occurred at school, and I looked into where the Xanax came from and found that it came from Dr. Tarapchak." (N.T. September 22, 105 p. 114). This Court permitted the Commonwealth to introduce this evidence, first because it demonstrated intent and knowledge by establishing that the Appellant supplied her minor child with a Xanax prescription, and that the minor child did not ingest the Xanax accidentally; second that it demonstrated motive to make a false statement under oath during a custody proceeding to conceal her illegal prescription practices and escape those consequences, the perjury charge grew out of the minor child's overdose; third that it explained the history and course of events surrounding the Appellant's criminal conduct in excessively supplying or dispensing prescriptions without good faith or in contradiction to accepted medical practices within the medical community. The evidence showed that the Appellant had excessively supplied or prescribed controlled substances to family members and paramours. See Commonwealth v. Brown, 52 A.3d 320, 332 (Pa. Super. 2012)(the history of the *res gestae* exception demonstrates that it is properly invoked when the bad acts are part of the same transaction involving the charged crime) See also Commonwealth v. Powell, 956 A.2d 406 (Pa. 2008)(trial court properly admitted evidence where the statement was offered not to show appellant's propensity to crime, but in the context of establishing the family environment and relationships among appellant).

62

Evidence of the Appellant's prescribing to her minor child, taught the jury about the course of the investigation that culminated in the Appellant's arrest. Moreover, the probative value of Agent Hischar's testimony outweighed its prejudicial effect as the Commonwealth introduced Agent Hischar's testimony for the purpose of proving intent, knowledge, and motive.

**B. Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it is alleged that the trial court allowed the testimony of Alex Tarapchak regarding custody proceedings and the Appellant's drug use?[33]**

Again, the Appellant failed to timely object to Alex Tarapchak's custody battle and drug use testimony. Therefore, the Appellant's challenge is waived. See Pa. R. A. P. 302(a); Commonwealth v. May, 887 A.2d 750, 758 (Pa. 2005); Commonwealth v. Brown, 359 A.2d 393 (Pa. 1976)(holding that the lack of a timely objection waived issue for appellate review). The Appellant is not entitled to relief. Notwithstanding, the history of the Appellant's custody litigation showed the chain or sequence of events that led to the underlying investigation. See Commonwealth v. Drumheller, 808 A.2d 893, 905 (Pa. 2002); Commonwealth v. Tyson, 119 A.3d 353, 360 (Pa. Super. 2015). Alex Tarapchak testified that he contacted the Drug Enforcement Agency regarding the Appellant as the result of acrimonious custody litigation between 2002 through 2013. He testified that he wrote a letter to the Drug Enforcement Agency because "there were just so many things that were continuing to happen and one day it had occurred to me that why no one did anything about it, you know because we were in front of all of these custody judges, you know, in Lackawanna County, Northhampton County, and no one ever did anything – she tested positive for drugs all the time, she was in the car with my

---

[33] Listed as issue 6 in the Appellant's Concise Statement of Errors

63

children while drinking, on drugs, you name it, and she would be punished in the effect that she would have supervised visits, different things like that, but she was committing criminal acts regularly and not only to my children." (N.T. September 24, 2015 p. 150-151). Here, Alex Tarapchak's testimony regarding the Appellant's custody litigation demonstrated the continual and escalating nature of the Appellant's criminal activity and illegal prescription practices. The Appellant's custody litigation is important to establish the history of the Appellant's relationship with her minor children and former paramours, to whom she provided prescriptions, as well as to show Alex Tarapchak's awareness of the Appellant's criminal activity. Furthermore, evidence of a defendant's drug-related activity is admissible to establish motive. Commonwealth v. Malloy, 856 A.2d 767 (Pa. 2004); See also Commonwealth v. Ross, 57 A.3d 85, 100 (Pa. 2012)(holding that to establish motive under 404(b), there must be a specific 'logical connection' between the other act and the crime at issue which establishes that the crime currently being ...... by the prior set of facts and circumstances); See Commonwealth v. Powell, 956 A.2d 406 (Pa. 2008)(finding that testimony was not offered to show criminal propensity, but in the context of establishing the family environment and relationships among the defendant).

Evidence that the Appellant abused prescriptions is motive that the Appellant engaged in criminal activity to support her addiction. Additionally, the Appellant's drug and alcohol abuse is relevant to establish that the Appellant acted recklessly, and provides context for later testimony that the Appellant ordered narcotics for herself and her paramour from the Moore catalog. Lastly, the probative value of Alex Tarapchak's testimony outweighed its prejudicial effect as the Commonwealth introduced his

64

testimony to explain the underlying investigation and show motive for the Appellant's criminal activity.

## C. Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it is alleged that the trial court allowed the testimony of Delton Bolton regarding the Appellant's drug and alcohol use?[34]

Delton Bolton, the Appellant's former paramour testified at length about his two (2) year relationship with the Appellant. During the course of their relationship, Mr. Bolton testified that he ingested and injected "all kinds of" drugs with the Appellant. (N.T. September 23, 2015 p. 181,183, 186-190, 194, 196, 228; September 24, 2014 p. 4-5, 35, 109-110, 116). Shortly thereafter, Mr. Bolton testified that the Appellant ordered excessive quantities of Percocet, Vicodin, and Phentermine/Adipex from the Moore catalog. Id. at 193, 195-198. He described an exchange system, in which the Appellant prescribed him Ritalin and Adderall, directing him to several different pharmacies to fill the prescriptions. Mr. Bolton then filled the prescriptions and gave them to the Appellant in exchange for excessive quantities of vicodin. Id. at 212-214; N.T. September 24, 2015 p. 43, 45-46. In particular, Mr. Bolton recalled that the Appellant consumed Adipex on a daily basis. Id. at 229. Mr. Bolton also testified about the Appellant's public intoxications and alcohol induced violence. (N.T. September 24, 2015 p. 23, 26,38). The Appellant only objected as to speculation during the length of Mr. Bolton's testimony regarding the Appellant's drug and alcohol use. In fact, the Appellant cross-examined Mr. Bolton about the Appellant's court ordered drug test requirements. Id. at 110-111. Regardless, the Appellant did not object as to inadmissible prior bad act evidence. The Appellant did not make a timely and specific objection, and therefore did

---

[34] Listed as issue 6 in the Appellant's Concise Statement of Errors.

65

not properly preserve the issue of whether this Court improperly admitted testimony regarding the Appellant's drug and alcohol abuse. See Pa. R. E. 103(a); Commonwealth v. Cousar, 928 A.2d 1025, 1041 (Pa. 2007)(citing that the rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made).

In the alternative, Mr. Bolton's testimony is admissible as evidence of motive demonstrating that the Appellant's criminal actions grew out of the Appellant's drug and alcohol abuse. Further, the Appellant's drug and alcohol abuse formed the history of the case becoming part of a chain of a sequence of events. The Appellant's drug and alcohol abuse is relevant because it occurred in the presence of Mr. Bolton, and with Mr. Bolton. Both the Appellant and Mr. Bolton became addicts, living together in a volatile relationship centered on the exchange of narcotics. In the relevant time period, Mr. Bolton explicitly showed the Appellant's addiction to prescription and street drugs. Mr. Bolton's testimony established the relationship with the Appellant, and the environment in which the Appellant operated her internal medicine practice, especially as to why the Appellant prescribed in the matter she did. Mr. Bolton's testimony also established state of mind, knowledge, absence of mistake, intent, and lack of good faith. The Appellant's drug and alcohol abuse is fundamental to the entire story; therefore any prejudice is outweighed by the probative value.

66

D. Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it is alleged that the trial court allowed the admission of the Appellant's custody hearing transcripts with judicial findings?[35]

In order to prove the charge of Perjury against the Appellant, the Commonwealth must prove that the Appellant made a false statement under oath or affirmation in an an official proceeding. In establishing the elements of this offense, the Commonwealth presented court reporter, Lorissa Senczakowicz to demonstrate that the Appellant appeared before the Honorable Margaret Bisignani-Moyle for a custody hearing. Ms. Senczakowicz testified to the accuracy of her notes and the transcription therof. (N.T. September 30, 2015 p. 137-140, 143-148). In the present case, the Appellant objected as to the authentication of the transcript. The Appellant's counsel did not object as inadmissible prior bad acts, instead on appeal the Appellant attempts to recast the basis of the objection by arguing that this Court erred in permitting prior bad act evidence. The Appellant did not make a timely and specific objection, and therefore did not properly preserve the issue of whether this Court improperly admitted custody hearing transcripts.

See Pa. R. E. 103(a); Commonwealth v. Cousar, 928 A.2d 1025, 1041 (Pa. 2007)(citing that the rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made); Commonwealth v. McGiff, 160 A.3d 863 (Pa. Super. 2017)(finding that appellant waived appellate review, although he lodged an anticipatory objection prior to the Commonwealth's calling of witnesses in connection with his motion *in limine*, counsel failed to make a timely and specific objection to their testimony at the time that it was actually proffered); Commonwealth v. Tucker, 143 A.23d 955 (Pa. Super. 2016); Commonwealth v. Houck, 102 A.3d 443 (Pa. Super. 2014); Commonwealth v. Rose,

---

[35] Listed as issue 6 in the Appellant's Concise Statement of Errors.

67

172 A.3d 1121 (Pa. Super. 2017)(the defendant did not preserve for appeal a claim that a burglary victim's testimony regarding incidents of intimidation was irrelevant and prejudicial where the defendant's objection at trial lacked specificity and merely asserted that the victim's statements were inadmissible hearsay).

Notwithstanding, admission of the custody hearing transcripts is necessary to complete the picture of the hearing at which the perjury occurred. See Commonwealth v. Robinson, 480 A.2d 1229 (Pa. Super. 1984)(finding no abuse of discretion in admission of evidence of crimes involved in a bail hearing in a prosecution for perjury which occurred at the bail revocation hearing, since, in establishing elements of perjury, Commonwealth could properly demonstrate that defendant had appeared for the bail revocation hearing, and reference to the prior criminal charges was necessary to complete the picture of the bail hearing at which the perjury occurred, the evidence was not offered to prove a general criminal disposition). The custody hearing transcripts demonstrate the Appellant's knowledge of her false statements and intent to conceal her prescription practices. See Commonwealth v. Kinard, 95 A.3d 279 (Pa. Super. 2014)(holding that other crimes evidence, telephone calls that the defendant made from prison in which he discussed drug transactions using terminology commonly employed by drug dealers to evade detection showed defendant's knowledge and awareness of drug trafficking, to support police officer's testimony that defendant was not merely an innocent visitor to place where drugs had been found, and to show defendant's knowledge and use of coded language). Therefore, when balancing the probative versus prejudicial nature of this evidence, the admission of the custody hearing transcripts is critical in helping the jury to understand that the Appellant's false statements were not a mistake.

68

E. Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it is alleged that the trial court allowed the testimony of Karen Mervine regarding the Appellant's role in patient addiction, and the manner in which the Appellant allowed Kelly McDonald to write prescriptions?[36]

Karen Mervine, the Appellant's former employee, testified that she personally observed the office manager, Kelly McDonald write prescriptions. (N.T. September 29, 2015 p. 42). She stated: "the doctor sometimes would be sick or say she was sick when she was upstairs, wouldn't come down and there would be a waiting room full of patients and Kelly would just write out scripts and give them to the patients and send them on their way"). Id. She further testified: "People called her Dr. Kelly that went there. My mom would even say that Kelly is like a doctor." Id. at 43. Subsequently, the Appellant objected as to hearsay, and this Court sustained the objection. The Appellant did not object to the admission of prior bad acts. Later on re-direct, Ms. Mervine testified that she consulted with the Appellant regarding her prescribing practices. Id. at 57. She stated: "I asked the doctor, I said 'Doc, is it legal for you to have Kelly, you know write prescriptions and sign your name?' and she just said 'Karen, you are not here for that, you are here to help me with my billing. Don't worry about it." Id. In response, the Appellant objected as to legal conclusion, and this Court overruled the Appellant's objection finding Ms. Mervine recounted her personal observations. Id. at 58. Ms. Mervine than testified that she became concerned with the types of patients the Appellant treated. Id. at 59. She explained that the patients "were already street users of drugs." Id. The Appellant objected without more, and this Court overruled based upon Ms. Mervine's ability to recount her personal observations and reasonable inferences

---

[36] Listed as issue 6 in the Appellant's Concise Statement of Errors.

69

therefrom. Id. at 60. On appeal the Appellant attempts to recast the basis of the objections by arguing that this Court erred in permitting prior bad act evidence. The Appellant did not make a timely and specific objection, and therefore did not properly preserve the issue of whether this Court improperly admitted Karen Mervine's personal observations of Kelly McDonald writing prescriptions or observations of the types of patients the Appellant treated. See Pa. R. E. 103(a); Commonwealth v. Cousar, 928 A.2d 1025, 1041 (Pa. 2007)(citing that the rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made); Commonwealth v. McGiff, 160 A.3d 863 (Pa. Super. 2017)(finding that appellant waived appellate review, although he lodged an anticipatory objection prior to the Commonwealth's calling of witnesses in connection with his motion in limine, counsel failed to make a timely and specific objection to their testimony at the time that it was actually proffered); Commonwealth v. Tucker, 143 A.23d 955 (Pa.

⋯ ⋯ Havek, 102 A.3d 443 (Pa. Super. 2014);

Commonwealth v. Rose, 172 A.3d 1121 (Pa. Super. 2017)(the defendant did not preserve for appeal a claim that a burglary victim's testimony regarding incidents of intimidation was irrelevant and prejudicial where the defendant's objection at trial lacked specificity and merely asserted that the victim's statements were inadmissible hearsay).

Alternatively, Ms. Mervine's testimony based on her own personal observations, discussed prior bad acts relevant and probative in explaining her employee/employer relationship with the Appellant, and the history of the Appellant's prescribing practices and fraudulent billing. Ms. Mervine's testimony established the Appellant's state of

70

mind, chain of events, knowledge, and absence of mistake. Therefore, the prejudicial impact of Ms. Mervine's testimony did not outweigh its probative value.

Additionally, Ms. Mervine testified that her mother became the Appellant's patient when she maintained a Frackville office, approximately nine (9) years prior to trial. Id. at 27. She explained that the Appellant prescribed her mother multiple medications, including Percocet, Oxycodone, Ativan, and Xanax. Id. at 29. As a result, Ms. Mervine testified that her mother acted strange, and ultimately suffered a head injury. Id. at 30-32. After the incident, Ms. Mervine recalled: "I went in her room and I went through everything and I found drugs all over the place and prescriptions [ . . . ] and I called a new doctor [ . . . ] and I explained to him that I believe my mom was an addict and I needed help because I was afraid she was going to overdose." Id. at 32. Again, as previously cited, Ms. Mervine's testimony based on her own personal observations, discussed prior bad acts relevant and probative in explaining her mother's patient/physician relationship with the Appellant, and the history of the Appellant's excessive prescribing practices. Ms. Mervine's testimony established the Appellant's state of mind, chain of events, knowledge, and absence of mistake. Similarly, the prejudicial impact of Ms. Mervine's testimony did not outweigh its probative value.

F.   Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it is alleged that the trial court allowed the testimony of Robert Phillips regarding the Appellant's illegal possession of prescription medication for which no criminal charges were filed? [37]

Robert Phillips, the deputy sheriff assigned to the Schuylkill County Domestic Relations Office testified that he served a bench warrant on the Appellant, and recovered "23 ½ small blue tablets in a — [ . . . ] wrapped in a cellophane cigarette pack wrapper

---

[37] Listed as issue 6 in the Appellant's Concise Statement of Errors.

71

inside her purse." (N.T. September 29, 2015 p. 87-88). He recalled the absence of a prescription bottle in the Appellant's purse, but noted that the Appellant identified the pills as Percocet 30s. Id. at 88. Mr. Phillips explained that he confiscated the pills because the Schuylkill County Prison prohibited contraband. Id. at 89-90. At this time, the Appellant objected as to relevance, and this Court overruled the Appellant's objection. Lastly, Mr. Phillips explained that the Schuylkill County Drug Task Force might pursue an investigation as to "how and why she possessed those pills." Id. at 90. The Appellant objected as to Mr. Phillip's reference to uncharged conduct, and this Court overruled the Appellant's objection based upon a prior evidentiary ruling allowing admission of evidence regarding the Appellant's drug abuse and addiction. Id. at 91. This Court allowed Mr. Phillips to continue his testimony, wherein he stated: "during her protest of me seizing her pills she had questioned me if I knew how bad she was going to withdrawal from the pills and she basically stated that she was addicted to the pills, that ... that when she goes to the prison she will not have access to those pills." Id. at 92. On cross-examination, the Appellant further elicited testimony from Mr. Phillips regarding the uncharged conduct. In response to the Appellant's questions, Mr. Phillips stated: "under the law you have to have a prescription bottle with a specific markings such as the dosage, the item that's in the bottle, and the name of the patient, name of the doctor and the dates and so forth and she had nothing. It was only a—pills were in a plastic bag [ . . . ] the defendant stated that she could produce a prescription, a written prescription from a doctor." Id. at 93-94. Mr. Phillips testified that the Appellant named "Ray Kraynak," as the prescriber. Id. at 94. Mr. Phillips

72

concluded that at the time of his testimony, the Appellant did not have any criminal charges pending in connection with her possession of the loose pills. Id.

First, evidence of the Appellant's drug abuse and addiction is admissible to show motive to commit criminal acts and support her addiction. Second, evidence of the Appellant's drug addiction explains the history of the case, including the events surrounding her criminal conduct for which the Appellant is charged. The probative value of Mr. Phillips' testimony outweighed the prejudicial effect in that the Appellant's addiction explains the deficient quantities of narcotics ordered from the Moore catalog that she supplied to herself and her patients as well as her excessive prescribing practices. See Commonwealth v. Malloy, 856 A.2d 767 (Pa. 2004); Commonwealth v. Walker, 656 A.2d 90, 98 (Pa. 1995)(finding that evidence is relevant to establish a course of conduct of drug-related activity and the history of the case); Commonwealth v. Pattakos, 754 A.2d 679 (Pa. Super. 2000)(holding that evidence of prior uncharged drug transactions admissible as to the existence of the relationship between the defendant and the informant critical to the jury's understanding of why the police targeted the defendant). Evidence of the Appellant's uncharged conduct is critical to the jury's understanding of the Appellant's drug addiction, and the means the Appellant utilized to continue and conceal her addiction.

G. Whether the trial court erred in admitting prior bad act evidence pursuant to Pa. R. E. 404(b), where it alleged that that trial court allowed testimony regarding the prescription statistics of the Appellant and Dr. Kraynick, who was not charged as a co-conspirator?[38]

The Appellant failed to timely object to Scott Rishel's testimony regarding the prescription statistics of the Appellant and Dr. Kryanick. Therefore, the Appellant's

---

[38] Listed as issue 6 in the Appellant's Concise Statement of Errors.

73

challenge is waived. See Pa. R. A. P. 302(a); Commonwealth v. May, 887 A.2d 750, 758 (Pa. 2005); Commonwealth v. Brown, 359 A.2d 393 (Pa. 1976)(holding that the lack of a timely objection waived issue for appellate review). The Appellant is not entitled to relief. Scott Rishel testified at length involving prescription statistics in the Ashland area, and the Appellant did not object. (N.T. September 29, 2015 p. 134-138). For example, the Commonwealth questioned Mr. Rishel: "And was there another doctor or doctors in the area that were also writing prescriptions?" Mr. Rishel responded: "we do have another doctor that does write for a lot of C2's that even now just about every other month we get a call from management saying, we're on the high usage report. But usually it is due to this other doctor too that we just see a lot." The Commonwealth further questioned: "And who would that be?" Mr. Rishel stated: "Dr. Raymond Kraynak." Id. at 135. The Appellant did not object. Later on cross-examination, in response to whether Mr. Rishel still received high usage calls despite Dr. Tarapchak's

[...] d in the affirmative. Id. at 160. Subsequently, on

re-direct, the Commonwealth questioned whether Dr. Kraynak remained the reason for high dosage calls. Mr. Rishel stated: "I feel it is why we're still high. I mean, with him, just the prescriptions that we see from his office [ . . . ] he had office hours in the same office there as what [Dr. Tarapchak] had, yes." Id. at 162. The Commonwealth then asked: "So they shared the same office?" In response, the Appellant objected as to relevance. This Court overruled the Appellant's relevancy objection since the Appellant failed to object on direct, and then challenged the issue on cross-examination. Id. at 163. The above excerpt shows relevancy as the basis for the Appellant's objection. The Appellant's counsel did not object as inadmissible prior bad acts, instead on appeal the

74

Appellant attempts to recast the basis of the objection by arguing that this Court erred in permitting prior bad act evidence. The Appellant did not make a timely and specific objection, and therefore did not properly preserve the issue of whether this Court improperly admitted prescription statistics erroneously suggesting illegal conduct with Dr. Kraynak. See Pa. R. E. 103(a); Commonwealth v. Cousar, 928 A.2d 1025, 1041 (Pa. 2007)(citing that the rule is well settled that a party complaining, on appeal, of the admission of evidence in the [c]ourt below will be confined to the specific objection there made); Commonwealth v. McGiff, 160 A.3d 863 (Pa. Super. 2017)(finding that appellant waived appellate review, although he lodged an anticipatory objection prior to the Commonwealth's calling of witnesses in connection with his motion *in limine*, counsel failed to make a timely and specific objection to their testimony at the time that it was actually proffered); Commonwealth v. Tucker, 143 A.23d 955 (Pa. Super. 2016); Commonwealth v. Houck, 102 A.3d 443 (Pa. Super. 2014); Commonwealth v. Rose, 2017)(the defendant did not preserve for appeal a claim that a burglary victim's testimony regarding incidents of intimidation was irrelevant and prejudicial where the defendant's objection at trial lacked specificity and merely asserted that the victim's statements were inadmissible hearsay).

Nevertheless, evidence of the Appellant's prescription statistics in conjunction with Dr. Kraynak's prescription statistics established knowledge that the Appellant excessively prescribed narcotics to her patients. Moreover, the Appellant's prescription statistics established her state of mind, particularly her lack of good faith in prescribing narcotics. Mr. Rishell's testimony regarding the Appellant's prescription statistics formed part of the natural development of the facts. Lastly, where Criminal Conspiracy

75

is charged, testimony regarding conspiracy-related activities is admissible. See Commonwealth v. Williams, 936 A.2d 12 (Pa. 2007)(holding that evidence of the same type of non-charged conduct was admissible to show the full extent and scope of the conspiracy). The probative value of the prescription statistics testimony outweighed its prejudicial effect as the Commonwealth introduced Scott Rishel's testimony to show knowledge and state of mind as well as the full extent and scope of the Appellant's charged conspiracy.

## JURY INSTRUCTIONS

A. Whether the trial court violated the Appellant's Due Process rights, where it is alleged that the trial court failed to instruct the jury that they must not draw any adverse inference from the Appellant's decision not to testify?[39]

A criminal defendant has a right to a no adverse inference instruction when the request for same is timely made. Commonwealth v. Lewis, 598 A.2d 975 (Pa. 1991). The charge is not required in all criminal cases, however once a defendant has expressed a clear intent to either include or exclude the charge that the defendant's intent must be carried out. Commonwealth v. Thompson, 674 A.2d 217, 220-221 (Pa. 1996). Pennsylvania law has made clear that a defendant's request for the charge requires the charge. See Commonwealth v. Stanley, 830 A.2d 1021, 1024 (Pa. Super. 2003)(the Court also held that while the "no adverse inference" instruction is not required in all criminal cases, when requested the charge must be given). In the instant case, trial counsel did not expressly request the "no adverse inference" instruction nor did counsel assert a contemporaneous objection to the omission. Pa. R. Crim. P. 647 provides, in relevant part, that "[n]o portions of the charge nor omissions from the charge may be

---

[39] Listed as issue 4 in the Appellant's Concise Statement of Errors.

assigned as error, unless specific objections are made thereto before the jury retires to deliberate." **Pa. R. Crim. P. 647(c)**. Furthermore, a defendant will waive a subsequent challenge if the response is in the negative when the court asks whether additions or corrections to a jury charge are necessary. See **Commonwealth v. Marquez, 980 A.2d 145, 150 (Pa. Super. 2009), appeal denied 987 A.3d 160 (Pa. 2009)**(defendant failed to object at the conclusion of jury charge and state that he had no objections or exceptions to it, claim waived under the requirements of Pa. R. Crim. P. 647(c)), citing **Commonwealth v. Pressley, 887 A.2d 220, 224 (Pa. 2005); Commonwealth v. Moury, 992 A.2d 162, 178 (Pa. Super. 2010)**(holding that a specific and timely objection must be made to preserve a challenge specifically where trial counsel did not respond when the trial court asked counsel if there were any questions regarding the charges and after instructing the jury later asked if counsel had anything further); **Commonwealth v. McCloskey, 835 A.2d 801, 812 (Pa. Super. 2003)**(finding claims concerning jury

. . . . . . . . . the instructions at the time

they were made and, further, did not mention the alleged errors at the close of the jury charge when the court specifically asked both parties if they were satisfied"). The proper procedure in making the objections is for counsel, at the completion of the charge and before the jury is removed from the court room, to request to approach the bench, and at side-bar, but on the record, specifically state what is objectionable about the charge. See **Commonwealth v. Sanchez, 82 A.3d 943, 978 (Pa. 2013)**(holding that even where trial court denies request for specific charge at charging conference, party must make a specific objections to its omissions when charge is given to preserve the issue for appeal). In the present case, at the completion of the charge, this Court held discussion at sidebar

77

between trial counsel, Attorney Brown, and the Commonwealth, Attorney Labar. The following exchange occurred:

> THE COURT: That was my final charge, any additions or corrections gentlemen?
>
> Mr. BROWN: No.
>
> Mr. LABAR: The only addition I would have, your Honor, is the charge regarding the stipulations, there were many stipulations on it.
>
> THE COURT: I will put those on the record. Thank you for reminding me.

(N.T. October 5, 2015 p. 114-115).

Attorney Brown responded in the negative when asked if he had anything to add to the jury instructions, and did not expressly request any corrections. Pursuant to Pennsylvania law, the Appellant did not specifically request a no adverse inference instruction at all. Further, at the time this Court issued the charge, the Appellant did not make a specific objection to its omission in order to preserve the issue for appeal. Supra, Sanchez. Thus, the Appellant's claim is waived. See Commonwealth v. Lewis, 598 A.2d 975, 982 (Pa. Super. 1991)(reasoning that as long as the defendant or his attorney makes a timely request for such a charge, this is sufficient to preserve the issue for appeal).

In the alternative, while this Court did not provide the "no adverse inference" instruction, it did instruct the jury during initial and closing instructions as follows:

> At the close of the Commonwealth's case, the attorney for the defendant may present evidence for the defendant. But as I told you before, the defendant has no obligation to offer evidence or to testify. Under our constitution and the law, every defendant is presumed to be innocent and has the right

78

to remain silent. The burden is always on the Commonwealth to prove the defendant guilty beyond a reasonable doubt.

(N.T. September 21, 2015 p. 7).

A fundamental principle of our system of criminal law is that a defendant is presumed innocent. The mere fact that she has been arrested and is charged with crimes is not evidence of her guilt.

Furthermore, a defendant is presumed to remain innocent throughout the trial unless and until you conclude based upon careful and impartial consideration of the evidence that the Commonwealth has proven her guilty beyond a reasonable doubt of the charges made against her. It is not the defendant's burden to prove that she is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the crime charged and that the defendant is guilty of those crimes beyond a reasonable doubt.

A person accused of a crime is not required to present evidence or to prove anything in her own defense. If the evidence presented fails to meet the Commonwealth's burden, then your verdict must be not guilty.

(N.T. October 5, 2015 p. 81-82).

instructed the jurors during voir dire, however the trial court failed to repeat this charge during final instructions. Relying on **Commonwealth v. Lewis**, supra, the **Howard** court held that the "no adverse inference" charge must be given at the time the jury is finally instructed before deliberations, if timely requested by the defendant. **Id.** at 1307. Here, this Court initially instructed the jurors during voir dire, and at the completion of trial that the defendant is not required to offer evidence or testify.

Additionally, while the Appellant did not testify, the Commonwealth presented overwhelming evidence against the Appellant. The Commonwealth presented approximately twenty-one (21) eyewitnesses, and several expert witnesses as well as hundreds of

79

demonstrative exhibits. Given the nature of the evidence presented at the Appellant's trial, the traditional concerns which prompt a request for, or a specific request to omit, the "no adverse inference" instruction are not present in this case. In contrast to the instant case, the situations which prompt counsel to consider requesting or omitting a "no adverse inference" instruction arise when the testimony of the defendant is vital to the nature of the defense asserted. The defense at trial focused upon the legality of the Appellant's actions, and whether criminal offenses had actually been committed citing lack of evidence. Therefore, the lack of a "no adverse instruction," would have no bearing on the Appellant's defense.

Finally, the Appellant is unable to assert that the verdict might have been different or the error contributed adversely had the instruction been given. Appellant received an acquittal on four (4) offenses: Criminal Conspiracy- Theft by Deception; Recklessly Endangering Another Person; Acquisition by Misrepresentation Fraud; and Prohibited Acts, Outside Scope of Practice. It is obvious that this Court's instructions cautioning the jury that the defendant had no obligation to testify or present evidence in her own defense, clearly defined the issues for the jury. The Appellant's acquittal on four (4) offenses is inconsistent with the notion that the Appellant's failure to testify instilled within the jury a fixed bias against the Appellant that rendered it incapable of basing its verdict on a fair assessment of the evidence. The acquittal was favorable, and reflects that the jury did not draw an adverse inference against the Appellant for failure to testify.

B. Whether the trial court deprived the Appellant of a fair trial, where it is alleged that the trial court failed to instruct the jury on the limited purpose(s) for which Rule 404(b) evidence might be considered?[40]

Preliminarily, counsel did not lodge a contemporaneous objection to the trial

---

[40] Listed as issue 7 in the Appellant's Concise Statement of Errors.

80

court's instruction. (N.T. October 5, 2015 p. 114). Moreover, the trial court conferred with counsel after instructing the jury, and asked counsel if there were "any additions or corrections?" Id. The Appellant's trial counsel responded: "No." Id. The Pennsylvania Superior Court has held that "[a] specific and timely objection must be made to preserve a challenge to a particular jury instruction. Failure to do so results in wavier. Commonwealth v. Moury, 992 A.2d 162, 178 (Pa. Super. 2010)("Generally, a defendant waives subsequent challenges to the propriety of the jury charge on appeal if he responds in the negative when the court asks whether additions or corrections to a jury charge are necessary"); Commonwealth v. McCloskey, 835 A.2d 801, 812 (Pa. Super. 2003) (finding claims concerning jury instructions waived because McCloskey "did not object to the instructions at the time they were made and, further, did not mention the alleged errors at the close of the jury charge when the court specifically asked both parties if they were satisfied"); Commonwealth v. Sanchez, 82 A.3d 943, 978 (Pa. 2013)(holding that even where trial court denies request for specific charge at charging conference, party must make a specific objections to its omissions when charge is given to preserve the issue for appeal). Importantly, the "failure to request a cautionary instruction upon the introduction of evidence constitutes a waiver of a claim of trial court error in failing to issue a cautionary instruction." Commonwealth v. Bryant, 855 A.2d 726, 739 (Pa. 2004); Commonwealth v. Wallace, 561 A.2d 719 (Pa. 1989)(trial counsel's failure to object when trial court did not issue cautionary instruction following introduction of evidence of defendant's prior incarceration resulted in waiver of any claim of error based upon trial court's failure to give cautionary instruction). Therefore, the Appellant's claim is waived. See also Commonwealth v. Tedford, 960 A.2d 1 (Pa.

81

Super. 2008)(when other crimes evidence is admitted, the defendant is entitled upon request to a jury instruction explaining to the jury that the specific evidence is only admissible for limited purposes). Here, the Appellant's counsel did not request a cautionary instruction either at the introduction of evidence, during the jury charge, or at the close of the jury charge.

## CONCLUSION

In summary, this Court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify granting the Appellant's requests for relief For the reasons set forth above, the judgment of this Court should be affirmed.

BY THE COURT:

JOHN L. BRAXTON      S.J.